## In re HANSON'S WILL

No. 3066.   Decided August 9, 1917.   (167 Pac. 256.)

1. NEW TRIAL—NOTICE OF MOTION—TIME FOR FILING—STATUTE.  Under Comp. Laws 1907, section 3294, providing that the party intending to move for new trial must within five days after verdict, if the action were tried by a jury, or after notice of the decision of the court or referee, if tried without a jury, file with the clerk and serve on the adverse party a notice of his intention, designating grounds, etc., proponents' second notice of motion for new trial, filed more than five days after the jury returned its special verdict, though within five days after judgment denying probate was entered, was properly stricken from the files as filed too late.[1]   (Page 212.)

2. TRIAL—SPECIAL AND GENERAL VERDICTS.  Where the special verdict covered every issue, general verdict was unnecessary to authorize judgment on the verdict.   (Page 213.)

3. WILLS—PROBATE—CONTEST—EXAMINATION OF WITNESSES.  Where there is a contest of a will offered for probate, the witnesses may be required to answer all questions respecting the due execution of the will and the mental capacity of testator at execution before the jury, with the privilege of cross-examination by the protestant, so that, in a will contest, the court properly impaneled the jury before hearing evidence respecting due execution.   (Page 213.)

4. WILLS—CONTEST—BURDEN OF PROOF.  It is the duty of the proponent of a will to produce his proof respecting the mental capacity of testator at execution and respecting due execution, the burden of proof being upon proponent as to such preliminary matters, but when he has made out a prima facie case by such proof, the burden of proof is on

---

[1] *Fisher* v. *Emerson,* 15 Utah, 517-622, 50 Pac. 619, distinguishing *Yerrick* v. *District Court,* 48 Utah, 619,  161 Pac. 55.

the protestant to overcome such case, and to produce proof respecting the matters presented in his protest. (Page 214.)

5. WILLS—INSANITY OF TESTATOR—EVIDENCE. In a will contest on the ground of insanity, contestant must establish the fact of insanity by a preponderance of the evidence.[1] (Page 215.)

6. WILLS—UNDUE INFLUENCE—BURDEN OF PROOF. The burden of proof in the issue of undue influence rests with the protestant.[2] (Page 215.)

7. TRIAL—FAILURE TO CHARGE—NECESSITY OF REQUEST—UNDUE INFLUENCE. Under Comp. Laws 1907, section 3147, providing that, when the evidence is concluded, the court shall instruct the jury in writing upon the law applicable to the case, in a will contest, where the court ruled at the beginning of trial that the burden of proof was on the proponent, but, in charging the jury, charged that as to the issue of insanity only the burden of proof was on the protestant, the court erred in failing to charge as to the burden on issue of undue influence, though proponent's counsel did not request an instruction thereon. (Page 217.)

8. WILLS—RIGHT OF TESTAMENTARY DISPOSITION. If testator was of sound and disposing mind and memory when he made his will, under the law he had the sole right to choose the objects of his bounty, and it is immaterial whether what he did was approved or disapproved by court or jury. (Page 220.)

9. APPEAL AND ERROR—REVIEW—FINDINGS OF JURY. In a law case the Supreme Court has no right to interfere with the jury's findings based on any substantial evidence, but the court cannot permit a judgment to stand unless it is based on findings based on some substantial legal evidence. (Page 220.)

10. WILLS—UNDUE INFLUENCE—SUFFICIENCY OF EVIDENCE. In a will contest, evidence *held* insufficient to support a jury finding of undue influence. (Page 220.)

11. WILLS—UNDUE INFLUENCE—PROOF. Though undue influence is seldom subject to direct proof, but, as a general rule, must be established by inferences and circumstances, a finding of undue influence cannot rest on mere suspicion. (Page 220.)

12. EVIDENCE—SANITY OF TESTATOR—OPINION TESTIMONY. Though it is proper to permit witnesses, testifying on probate of a will on the subject of mental incapacity, after detailing the facts to express an opinion respecting testator's sanity on the date of execution, the facts on which the opinion is based should be relevant to the issue, and not too remote in point of time, the test being whether testator had testamentary capacity when the will was made, so that the inquiry should

---

[1] *In re Estate of Van Alstine*, 26 Utah, 193-208, 72 Pac. 942.

[2] *Miller* v. *Livingstone*, 31 Utah, 419, 88 Pac. 338; *Anderson* v. *Anderson*, 43 Utah, 26, 134 Pac. 553.

be limited to a period of time not too remote from that event. (Pags 221.)

13. WILLS—TESTAMENTARY CAPACITY—ECCENTRICITIES AND IDIOSYNCRA-SIES—''INSANITY.'' Eccentricities and idiosyncrasies, however gross, do not constitute ''insanity,'' and cannot incapacitate one otherwise mentally sound from making a valid will. (Page 222.)

14. WILLS—SANITY OF TESTATOR—SUFFICIENCY OF EVIDENCE. In a will contest, evidence *held* to support the jury's special finding that testator was not insane when he made the will. (Page 222.)

15. EVIDENCE—CAPACITY AND UNDUE INFLUENCE—OPINION TESTIMONY. Though in will contests great latitude is necessarily permitted in introducing evidence on the question of mental capacity and undue influence, courts should be careful to confine the evidence within reasonable limits, and opinions of lay witnesses should not be permitted unless the witnesses possess personal knowledge as to the facts on which their opinions are based. (Page 222.)

16. EVIDENCE—OPINION TESTIMONY—INSANITY OF TESTATOR. In a will contest, opinion testimony of lay witnesses as to testator's insanity, one of the witnesses stating that she based her opinion simply on what she saw and what she heard her mother say about testator, never having herself talked with testator, and having had little to do with him since her mother's death, five years ago, the other witness basing his opinion on matters occurring 10 or 12 years before testator's death, was inadmissible as too remote, since where, from the facts detailed by the witness, the jury may draw an inference that the subject of the inquiry was of unsound mind, the witness may also be permitted to express his opinion, but where no such inferences are deducible from the facts, the witness may not give his opinion. (Page 223.)

17. APPEAL AND ERROR—DIRECTION OF JUDGMENT. In a law case the Supreme Court is loth to direct judgment on appeal, except in cases involving law questions only, but, though questions of fact may be involved, if each party has had a fair and adequate opportunity to present his case, courts should not permit the litigation to proceed merely to satisfy a litigious spirit. (Page 224.)

Appeal from District Court, Third District; *Hon. M. L. Ritchie,* Judge.

Application of Ernest N. MacGregor for probate of will, of Peter Hanson.

From judgment denying probate, the proponent appeals.

REVERSED and case remanded with directions to grant a new trial.

*Geo. Y. Wallace, Jr.*, for appellant.

*Ashby Snow* for respondent.

FRICK, C. J.

Peter Hansen, a resident of Salt Lake City, died testate on the 23d day of May, 1916. He left surviving him two sons of the ages of forty-seven and thirty-three years, respectively, and three daughters, aged thirty-eight, thirty-five, and thirty-one years. His wife had obtained a divorce from him in 1904 and thenceforth he continued single, living entirely apart from his family. On the 3d day of November, 1915, or a little more than five months before he died, he executed what is termed his "last will and testament," in which he made one Ernest N. MacGregor and one M. McConnell his residuary legatees and also named them as executors of his will. The testator left the will with MacGregor's wife about six weeks after its execution. In due time the said Ernest N. MacGregor produced the alleged will and filed an application under our statute to have the same admitted to probate. After the application had been filed three of the children aforesaid, to wit, two of the daughters and the youngest son, filed their protest against the admission of the alleged will to probate. The grounds alleged in the protest were: (1) That at the time of the execution of said will the testator was of unsound mind; (2) that said alleged will was not executed as provided by our statute; and (3) that it was obtained by fraud and undue influence. The last ground of contest above named was in the following words:

"That the said decedent at the time of the signing of the said alleged will or document was of feeble and unsound mind, and the said Ernest N. MacGregor and M. McConnell, while the said decedent was of feeble and unsound mind, for the purpose of defrauding the heirs of the said deceased of their interest in his estate by constantly associating themselves with the said decedent and by gaining a predominance over his will and mind by persuasion and inducements, did, as your petitioners are informed and believe, by such persuasion

and undue influence, overcome the will of the said decedent, if any he then possessed, and did fraudulently and wickedly induce the said decedent to sign his name to the said document or alleged will; that the said signature was obtained wholly by the exertion as aforesaid of such undue influence and fraud exerted upon the mind of the decedent, all of which caused him to sign his name to the said document; and that except for such acts and undue influence the decedent would not have signed his name thereto.''

The proponent of the will filed an answer to the protest in which he in effect denied all the allegations contained in the protest, and, on the contrary, averred that the alleged will was duly and properly executed, and that the testator was of sound and disposing mind at the time of its execution, and that he was not influenced, etc.

The issues were submitted to a jury, and they made answer to special findings submitted to them as follows:

''Q. Were there two attesting witnesses, each of whom signed his name as a witness at the end of said document at the request of said Peter Hansen, in his presence and in the presence of the other? A. Yes. Q. If you shall find that said Peter Hansen subscribed the said document, was he at the time of so doing of sound and disposing mind? A. Yes. Q. Was said alleged will procured to be made by the fraud or undue influence of Ernest N. MacGregor or M. McConnell or either of them? A. Yes.''

It would seem that the first special finding was unnecessary in view that what is therein contained was admitted in open court by the contestants.

The record discloses that the jury were polled, and that, while all of the eight jurors answered the first two findings in the affirmative, only six of them answered the third finding in the affirmative, and two answered it in the negative.

No general verdict was submitted to the jury or returned by them. The court, however, directed judgment to be entered on the special findings denying the proposed will probate upon the sole ground that ''the same was obtained by the

exercise of undue influence." On December 30, 1916, judgment was entered accordingly.

In due time after the jury had returned the special verdict the proponent filed his notice of motion for a new trial, and on January 3, 1917, within five days after judgment was entered, he filed a second notice of motion for a new trial. The court overruled the first motion for a new trial, and, on motion of the protestants, struck the second motion from the files. Counsel for the proponent now insists that the court erred in striking his second motion. We think not.

Comp. Laws 1907, section 3294, provides as follows:

"The party intending to move for a new trial must, within five days after the verdict of the jury, if the action were tried by a jury, or after notice of the decision of the court or referee, if the action were tried without a jury, file with the clerk, and serve upon the adverse party a notice of his intention, designating the grounds upon which the motion will be made, and whether the same will be made upon affidavits or upon the minutes of the court."

It will be observed that under our statute the application for a new trial is directed against the verdict, and not the judgment, and hence the notice of motion must be given within the time fixed by statute after the verdict is returned, regardless of when judgment is entered. Such is also the holding of this court. *Fisher* v. *Emerson,* 15 Utah, 517-522, 50 Pac. 619. Nor is there anything to the contrary in the recent case of *Yerrick* v. *District Court,* 48 Utah, 619, 161 Pac. 55. While the writer's views did not prevail in that case, yet there is nothing in the majority opinion which is contrary to my views there expressed, that under our statute the verdict, and not the judgment, is the thing that is assailed by a motion for a new trial. Indeed that is the clear purport of our statute. Nor was it necessary for the jury to return a general verdict in addition to their special verdict, as contended by counsel for proponent. Comp. Laws 1907, section 3162, provides that a verdict of a jury may be either general or special. In that section the verdicts are defined thus:

"A general verdict is that by which they [the jury] pronounce generally upon all or any of the issues, in favor of either the plaintiff or defendant; a special verdict is that by which the jury finds the facts only, leaving the judgment to the court."

In this case the special verdict covered every issue, and therefore a general verdict was unnecessary. In case a special verdict does not cover every issue, then, as a matter of course, a general verdict is necessary to authorize a judgment on the verdict. It follows, therefore, that the district court did not err in failing to have the jury return a general verdict in this case.

It is next contended that the district court erred in not permitting the proponent to make formal proof of the due execution of the will, etc., before impaneling the jury to try the issues presented by the protestants, and in ruling that the burden of proof was on the proponent. Where there is no contest, the testimony of the subscribing witnesses to the will is usually taken either by deposition or by written answers in open court, or answers are made to the formal statutory questions propounded to such witnesses. Where there is a contest, however, as in this case, then the witnesses may be required to answer all questions respecting the due execution of the will and the mental capacity of the testator at the time of its execution before the jury, with the privilege of cross-examination by the protestants, as in other cases. In 1 Underhill on the Law of Wills, section 86, the author approves the method just outlined. The court therefore did not err in impaneling the jury before hearing the evidence respecting the due execution of the will, etc.

Upon the question of burden of proof the district court after announcing the purpose of the several pleadings, ruled as follows:

"The burden of proof will be upon the proponent and he will have the right of opening and closing"

—to which ruling the proponent excepted. The court therefore proceeded to try the issues upon that theory, but in charging the jury entirely omitted to charge respecting the burden

of proof upon the issue of undue influence, although it charged
that the burden of proof on the issue of insanity or mental
capacity was on the protestants.  With respect to who has the
burden of proof upon the question of mental capacity when
that is in issue the authorities are in apparent conflict.  The
divergent views, however, to a large extent at least, are due
to the fact that courts have not always discriminated between
the trial of a will case where the contest arises before the will
is admitted to probate and one where the contest arises after
that formality has taken place.  There is little, if any, conflict
relating to the burden of proof in a case where the contest is
initiated after the will has been admitted to probate except
upon the ultimate fact in case the mental capacity of the
testator is in issue.  But there is much confusion in cases like
the present, where the contest is initiated before the will is
formally admitted to probate.

In a case like the present we conceive the great weight of
authority to be to the following effect: That in any case, un-
less these matters are admitted by the protestant, it is the
duty of the proponent to produce his proof respecting
the mental capacity of the testator at the time of the
execution of the will and the due execution thereof.
As to these preliminary matters the burden of proof is, as a
matter of course, upon the proponent; that is, he is bound
to make a prima facie case.  He does that by making proof
of the foregoing preliminary matters.  When the proponent
has made out a prima facie case, therefore, then, and then
only, the real legal battle begins, and the burden of proof is
upon the protestant to overcome the prima facie case and to
produce proof respecting the matters presented in his pro-
test.  In Thompson on Wills, which is a recent work (1916),
section 498, it is said:

"Before a will can be probated proof must be made of its proper exe-
cution, the testator's signature, the attestation of the witnesses, the pub-
lication of the will, and such like matters, and the burden of proving such
facts rests upon the propounder.  The proof in support of probate must
be sufficient to convince the court that the paper produced is the lawful
will of the testator.

"A prima facie case is made when it is shown that all the requirements
of law have been observed in the execution of the will, and unless such

Appeal from Salt Lake County, Third District

prima facie case is made the court should refuse probate even where probate is not contested.''

Upon whom ultimately rests the burden of proof in case the mental capacity of the testator is made an issue the authorities are not in harmony. In some jurisdictions the same rule is adopted respecting the burden of proof on the issue of insanity in a will contest that prevails in a criminal prosecution where insanity is a defense, which is that the burden ultimately rests upon the proponent to show that the will is the product of a sane mind by a preponderance of the evidence on that issue. Such is the rule that is laid down by Mr. Schouler in his excellent work on Wills, etc., in volume 1 (5th Ed.), section 174. There are, however, numerous authorities to the contrary in which it is held that the burden of proof rests upon him who makes the allegation and that he must establish the fact of insanity by a preponderance of the evidence. This court, in will contests, is committed to the latter doctrine. *In re Estate of Van Alstine*, 26 Utah, 193-208, 72 Pac. 942. Such is also the holding in some of our neighboring states where statutes like ours are in force. *In re Williams' Will*, 50 Mont. 142, 145 Pac. 953; *In re Murphy's Estate*, 43 Mont. 353, 116 Pac. 1004-1010, Ann. Cas. 1912C, 380. In view that this court, under our statute, is committed to the doctrine before stated, it is not necessary to multiply authorities upon that question. The district court followed the rule announced in the Van Alstine Case, and hence committed no error.

With respect to the issue of undue influence, however, the district court erred in holding that the burden of proof rests on the proponent. The great weight of authority is to the effect that upon that issue the burden of proof rests upon the protestant. Referring again to 1 Schouler on Wills, etc., section 239, the author says:

''The burden of proving fraud or force in the procurement of a will (unlike the simple issue of testamentary capacity) lies upon those who contest the instrument; and anything which imputes heinous misconduct to a party concerned and interested in its execution ought to be fairly established by a preponderance of proof. As to undue influence, in the usual and less offensive sense, the burden of proving affirmatively that it operated upon the will in question lies still on the party who alleges it,

either by direct evidence or proof of cicumstances inconsistent with fair dealing. In any such case, however, we assume that it has already been proved satisfactorily by the proponents that the will had been duly executed by a person of competent understanding and apparently a free agent. 'In order to set aside the will of a person of sound mind,' observes Lord Cranworth, 'it is not sufficient to show that the circumstances attending its execution are consistent with the hypothesis of its having been obtained by undue influence; it must be shown that they are inconsistent with a contrary hypothesis.' And the same holds true where positive fraud or force is the ground of objection. For a testator adjudged competent to make a will may be presumed to have known and intended its contents.''

Our own decisions are all to that effect. *Miller* v. *Livingstone,* 31 Utah, 419, 88 Pac. 338; *Anderson* v. *Anderson,* 43 Utah, 26, 134 Pac. 553. In those two cases it is also thoroughly explained what is necessary to constitute undue influence.

While, as before stated, at the beginning of the trial the district court ruled that the burden of proof was upon the proponent, yet in charging the jury the court charged that as to the issue of insanity only the burden of proof was on the protestant, and as to who had the burden of establishing the issue of undue influence the court did not charge anything. Counsel for proponent contends the court's failure to charge upon that issue is error. He predicates his argument upon Comp. Laws 1907, section 3147, which provides:

''When the evidence is concluded, the court shall instruct the jury in writing upon the law applicable to the case.''

It is contended that it is the duty of the court to charge the jury upon all the material propositions of law ''applicable to the case,'' and that in omitting to charge respecting the burden of proof upon a principal or material issue the court has failed to comply with the provisions of the statute. Counsel for the protestants, however, answer the contention by pointing to the fact that proponent's counsel was himself derelict in not requesting an instruction upon the question of the burden of proof respecting undue influence. With respect to a party's right to request instructions, section 3148 provides:

''Either party may, before the court has instructed the jury, or later by consent of the court, ask special instructions.''

It has frequently been held by this court that, if a party desires to have the jury instructed upon a special matter, he cannot predicate error upon the court's failure to charge unless he has requested a proper instruction upon the subject in hand. This case is, however, out of the usual order. Here the court at the beginning of the trial in open court announced to counsel that the burden of proof was upon the proponent. To that ruling proponent duly excepted. In view, therefore, that the court had ruled respecting the burden of proof, counsel was perhaps excused from a further insistence upon his views in that regard. Moreover, the instruction regarding the burden of proof, under the circumstances of this case, was, in our opinion, not a matter upon which the "special instruction" mentioned in the statute must be asked. The instruction was upon a question of law "applicable to the case," and hence should have been given by the court in its general charge, and especially so since it had announced what the rule was at the beginning of the trial.

While we do not desire to be understood as holding that it would be error under all circumstances to omit to charge upon the question of burden of proof, yet, in view of the peculiar circumstances of this case, we are of the opinion that the court erred in failing to instruct the jury upon the question of burden of proof on the issue of undue influence, and that it was not necessary under all the circumstances of this case for the proponent to offer an instruction upon that question in order to predicate error on the court's failure to charge. Indeed, the finding of the jury upon that subject, as hereinbefore shown, conclusively shows that in this case the proponent was greviously prejudiced by the court's failure to instruct the jury respecting the burden of proof upon the issue of undue influence. · We remark that no hard and fast rule can be laid down with regard to the question of when and under what circumstances it may be prejudicial error in case a court fails to instruct upon a particular question, and especially upon the question of burden of proof. Each case must, to a large extent at least, be determined upon its own peculiar facts and circumstances. All

we hold is that under the circumstances outlined the failure to instruct as before stated constituted prejudicial error.

Counsel, however, also vigorously insists that the finding of the jury that the will in question was obtained by undue influence is not supported by any evidence. We have read the whole evidence with care, and, after doing so, are forced to the conclusion that there is not a scintilla of evidence in support of the finding upon that issue. Indeed, in this case there is not even a syllable of evidence that there was any motive, inducement, or inclination to practice undue influence, or any influence upon the testator. Neither one of the beneficiaries named in the will, not even the testator's children, had any knowledge whatever that he was possessed of any property or means. No one suspected that he had anything in excess of what was "necessary to bury him," as he frequently expressed it to those with whom he held intercourse at all. Nor can it be said that the residuary legatees could have influenced the testator because of their ill will or feeling against the children, since they were total strangers to all of them. Moreover, the record shows beyond peradventure that the testator hoped to spend his last days and to die in Denmark, his fatherland. From his correspondence with friends in that country it is made very clear that had it not been for the breaking out of the present European war he in all probability would have gone to Denmark to spend his last days and to die, and in that event he, as a matter of course, would have taken all of his property, which consisted entirely of savings deposits in one of our savings banks, with him. From the time his wife obtained a divorce in 1904, upon the ground of nonsupport, the testator lived by himself as a recluse in what, in the evidence, is called a shack. In the last eleven years of his life he always posed as being entirely destitute of means, and every one who came in touch with him supposed him to be not only poor, but oftentimes in abject want. The proponent, one of the residuary legatees, his wife, and McConnell, the other residuary legatee, and his wife, after the divorce aforesaid, and after the testator was separated from his family, often befriended him in one way and another,

They gave him odd chores to do and frequently provided him with meals and gave him newspapers and magazines to read, which he seemed to appreciate. He was afflicted with some throat trouble, was hard of hearing, and also had some difficulty with his eyes. In view of those infirmities he was not excessively gregarious, and always seemed lacking in sociability. McConnell, one of the principal beneficiaries, had not seen him for six years immediately preceding his death, and knew nothing about the will until he was told about it after the testator's death. As before stated, the will was delivered by the testator to the proponent's wife, which act of delivery occurred about six weeks after it was executed. Neither the proponent nor McConnell knew that the testator intended to make a will, much less that he intended to make them his principal legatees. And, what is more, they did not even suspect that he had any property to bequeath to them or to anybody. True, the ward bishop told the relief society that the testator had means and that the society should not further assist him. The testator, however, convinced that society that he was without means, and it assisted him to the end of his life. In his home life he was most unhappy. He was clearly an eccentric, and in some respects very much so, and by reason of his infirmities, as before stated, was at times unfriendly, always unsociable, to say the least. He always seemed untidy in his person and clothing, if not actually filthy, and during many years lived all to himself in the shack before stated. It seems his children did not do anything for him after he was divorced, although one or two sometimes called upon him; and he, even before the divorce, never did anything for them. They did not even know of his last sickness. The testator's feelings respecting his children is clearly reflected in the following statement, which, for some purpose, was introduced in evidence, and which was shown to be in his handwriting, written in the Danish language. This statement was found by one of the witnesses in the shack where the testator lived until the day preceding his death. It reads:

"They [his family] got my home and money by false pretend. All this, together, I deem this sufficient because of

the cruel, unjust treatment I received while living with them. After making my life miserable it would be an injustice to my memory for them to share or enjoy any part of what I have by the assistance of kind-hearted and upright friend.''

The evidence also makes clear that the foregoing statement was not the result of any hallucination or aberration of mind; that it was based upon the testator's actual experiences. True, his domestic troubles may have been exaggerated by him, as is often the case, but that is of no consequence here. It is beyond dispute, therefore, that the testator left some reason behind him showing clearly what induced him to make his will as he did. If he was of sound and disposing mind and memory when he made it, and the jury found that he was, then, under the law, he had the sole right to choose the objects of his bounty, and it is utterly immaterial whether what he did is approved or disapproved by either court or jury. That right it is the duty of the courts to protect and enforce, and not to fritter it away by entering a judgment which perhaps reflects only their own views, or the views of the jury, regarding the disposition a testator should have made of his property.

This is a law case, and, in view of that fact, we have no right, nor have we the inclination if we had the right, to interfere with the findings of the jury in such a case where such findings are based upon any substantial evidence. We may, however, not disregard both our duty and our oaths of office and permit a judgment to stand, unless it is based upon findings which are based upon some substantial legal evidence. There is no such evidence in this case upon the issue of undue influence, and hence the finding of the jury is not supported by evidence and the judgment is not sanctioned by law. As a matter of law we are required, therefore, to set the findings and judgment aside.

In what we have said we are not unmindful of the protestants' contention that undue influence is seldom subject to direct proof, but, as a general rule, must be established by inferences and circumstances. While that is true, it likewise is true that a finding of undue influence

cannot rest upon mere suspicion.   There must be some sub-
stantial facts upon which the inferences and deductions are
based, and the circumstances relied on should clearly point
out the person who it is alleged exercised the undue influence
and his acts constituting the alleged undue influence.   There
is absolutely no fact or circumstance in this case authorizing
any one to find that the residuary legatees, or any one of
them, exercised the slightest influence on the testator.   Nor is
there any evidence whatever that the will as written was not
the sole product of the testator's mind.   Under such circum-
stances it would constitute most flagrant error to permit the
judgment to stand.

While the jury found in favor of the proponent upon the
issue of insanity, yet, in view that we must reverse the judg-
ment, we feel bound to make a few observations upon that
issue.   The evidence on part of the protestants was practically
all directed to that issue.   The testator, as appears from the
will itself, was seventy-nine years of age when the will was
made.   He, in his own handwriting, gave the directions to
the scrivener, who prepared the will according to those direc-
tions.   There is absolutely nothing to indicate that the testator
was not fully competent to make a will at the time, and, if his
correspondence with his friends in Denmark is considered,
he certainly possessed more than sufficient intelligence to make
a valid will.   The testimony of the scrivener and the other
subscribing witness respecting the mental capacity of the
testator is likewise clear and convincing.

The witnesses testifying for the protestants upon the sub-
ject of mental capacity were all lay witnesses, and,
after detailing the facts, the court in every instance        12
permitted the witnesses to express an opinion respect-
ing the testator's sanity on the date the will was executed.
Now, while that is a proper method of procedure, and in many
cases the most satisfactory method, yet the facts upon which
the opinion is based should be relevant to the issue and should
not be too remote in point of time.   It should always be re-
membered that in such cases the test is whether the testator
had testamentary capacity at the time the alleged will was

made, and the inquiry should be limited to a period of time not too remote from that event. In this case the court permitted one of the witnesses to express an opinion respecting the testator's sanity, although the witness testified:

"Never had any conversation with him [the testator]. I base my opinion simply on what I saw and what I heard my mother say about him."

This, too, notwithstanding the fact that her mother had been dead five years when the witness testified, and the further fact that after the mother's death intercourse between the testator and the witness practically ceased. Another witness based his opinion upon what he concluded was an unintelligent answer on the part of the testator. The witness was asked on cross-examination to give some instance which induced him to question the testator's sanity. He gave an instance occurring perhaps ten or twelve years before the death of the testator. The instance is reflected in the following questions and answers:

"Q. Was there anything irrational in his conversation? When you asked him a question was he able to answer it intelligently? A. Well, I would not call it intelligent. Q. Well, give me his answer that he would make to a question that was not intelligent in your opinion. A. Why, when I asked him to get some gloves for his hands to prevent freezing his fingers, he said he didn't have any money. Q. That is your opinion of an nonintelligent reply to the question? A. Yes, sir. Q. Did you ask him why he did not get any gloves? A. Yes, sir; I asked him why he did not get any gloves, and he said he did not have the money. Q. Can you think of anything else? A. Not at this time."

It is upon instances similar to those just illustrated, and upon the facts that the testator was untidy in his personal habits and dress and at home, and that he had a miserly disposition and an entire lack of affection for his offspring, which were the principal grounds that induced the witnesses to consider him of unsound mind. Indeed, the weight of the evidence is to the effect that they considered him so because he was unlike other men. He was

not as they observed other men, and expressions of that character. The fact is that the evidence discloses eccentricities on the part of the testator which at times were induced and aggravated by the fact that the testator was afflicted with the physical infirmities of being deaf, of having some ailment of the throat and of the eyes. True, he had some other physical defects, but those were of minor importance. Eccentricities and idiosyncrasies, however gross, do not constitute insanity, and cannot incapacitate one otherwise sound from making a valid will. The finding of the jury that the testator was not insane at the time he made the will is not only supported by, but it is the only conclusion permissible under, the evidence. While in such cases great latitude is necessarily permitted in introducing evidence upon both the questions of mental capacity and undue influence, yet courts should be careful to confine the evidence within reasonable limits, and opinions by lay witnesses should not be permitted unless such witnesses possess personal knowledge respecting the facts upon which their opinions are based.

We think the district court transcended the bounds of reason and the rules of evidence in permitting the two witnesses to express their opinions respecting the sanity of the testator at the time of the making of the will based **16** upon the facts detailed by them. Here again let it be understood that no hard and fast rule can be laid down governing all cases. All that can be said is that a witness should be permitted to state the facts fully, and if from the detailed facts the jury may draw an inference that the subject of the inquiry was of unsound mind, the witness may also be permitted to express his opinion respecting the sanity, and in that way enlighten the jury to some extent upon that question. Where, however, no such inferences are legitimately deducible from the facts testified to by the witness, he may not, nevertheless, give his opinion respecting the mental capacity of the testator. If that were permitted, the witness would entirely usurp the functions of the jury in such cases.

From what has been said it follows that the judgment should be, and it accordingly is, reversed. In view, however, that

there is no evidence in this case respecting the issue of undue influence, and the evidence on the issue of mental capacity is so strong and clear in favor of the will, the question arises whether we should, as insisted by counsel for the proponent, direct the court to admit the will to probate or whether we should merely reverse the judgment.

This is a law case, and in such cases we are very loth to direct judgment except in cases involving law questions only. Even in law cases sometimes, although questions of fact may be involved, yet if each party has had a fair and adequate opportunity to present his side of the case, courts should not permit the litigation to proceed merely to satisfy a litigious spirit. This court is, however, merely a reviewing court, and notwithstanding the failure on the part of the protestants to make a case, we shall nevertheless merely reverse the judgment and permit the district court to protect the interests of all who are interested in this case.

The case is therefore remanded to the district court of Salt Lake county, with directions to grant the proponent a new trial; costs to be paid out of the assets of the estate.

McCARTY, CORFMAN, THURMAN, and GIDEON, JJ., concur.