## In re HANSEN'S WILL.

No. 3227.   Decided Oct. 28, 1918.   (177 Pac. 982.)

1.  WILLS—CAPACITY—EVIDENCE.   Evidence *held* to show that testator thoroughly understood and comprehended the effect and consequences of what he was doing when he signed the will, so as to meet the requirements of the statute as to the execution of a valid will. (Page 564.)

2.  WILLS—CAPACITY—"INSANE DELUSION."   An "insane delusion" is a belief which has no basis in reason, and which cannot be dispelled by argument.   (Page 568.)

3.  EVIDENCE—BASIS OF OPINIONS—INSANE DELUSION.   Opinions of witnesses as to mental incapacity must be founded on and be deducible from facts which in law, if true, would in some manner justify the conclusion of the witness as to incompetency.   (Page 569.)

4.  WILLS—TESTAMENTARY CAPACITY—EVIDENCE.   In will contest, testator's personal habits, general behavior, eccentricities, age, physical infirmities, attitude toward his children, and disposition of

property may be considered in determining capacity to make will. (Page 569.)

5. WILLS—CAPACITY—ECCENTRICITY. That the testator, of foreign birth, inured to hardship and scant means of living, did not measure up to the ideals of American life, should not mitigate against his right to dispose of his property by will. (Page 569.)

6. WILLS—PROBATE—APPEAL—SCOPE OF REVIEW. In will contest, the court on appeal is not absolutely bound by the verdict, but may scrutinize carefully the testimony, to determine whether there is any substantial evidence to support the verdict, and, if there is none, it should reverse the judgment. (Page 570.)

7. APPEAL AND ERROR—DISPOSITION—SECOND APPEAL. In will contest, wherein all matters of evidence were carefully gone into, and the evidence was not substantially different at the second trial, after the original judgment was reversed on appeal for insufficiency of evidence, court may properly set aside a similar verdict against the will and order it to be admitted to probate. (Page 571.)

Appeal from the District Court of Salt Lake County, Third District; *Hon. J. Louis Brown,* Judge.

Proceeding for the probate of the will of Peter Hansen, deceased, on petition of Ernest N. MacGregor, proponent, wherein Mrs. Catherine Hansen Brown and others filed protest.

Judgment on verdict for contestants, and proponent appeals.

JUDGMENT VACATED, and will admitted to probate.

See, also, 50 Utah, 207, 167 Pac. 256.

*George Y. Wallace, Jr.* for appellant.

*James Ingebretsen* and *Ashby Snow* for respondents.

CORFMAN, J.

Peter Hansen, a resident of Salt Lake City, died May 23, 1916, leaving a will, the subject of this controversy, dated

November 3, 1915. He left surviving him five children, two sons, aged forty-seven and thirty-three years, and three daughters, aged thirty-eight, thirty-five and thirty-one years, respectively.

At testator's death his entire estate, aside from a few personal effects of practically no value, consisted of $4,829.80 credit or savings account with Zion's Savings Bank & Trust Company, a banking institution of Salt Lake City. Under the provisions of the will he bequeathed $5 to each of his said children, $50 to the Relief Society of the Twenty-Eighth Ecclesiastical Ward of Salt Lake City, and the residue to Ernest N. MacGregor and M. McConnell, whom he also named as executors as well as residuary legatees. About two months after the will had been executed he placed it in the keeping of Mrs. MacGregor, the wife of Ernest N. MacGregor; and in due time after testator's death the will was, upon petition of proponent, Ernest N. MacGregor, presented for probate. Thereupon Mrs. Catherine Hansen Brown, Daniel Hansen, and Anna Hansen Richards, three of the children of Peter Hansen, filed a protest against the admission of the will to probate upon four grounds, viz.:

"(1) That said alleged will or document now offered for probate is not the will and testament of said decedent; (2) that at the time of signing the said document or alleged will the said decedent was not of sound mind and was mentally incapacitated to make a will; (3) that said will was not attested, witnessed, or signed as required by law, nor was the same by decedent declared to be his last will as required by law, as your petitioners are informed and believe; (4) that the said decedent, at the time of the signing of the alleged will or document, was of feeble and unsound mind, and the said Ernest N. MacGregor and M. McConnell, while the said decedent was of feeble and unsound mind, for the purpose of defrauding the heirs of the said deceased of their interest in his estate, by constantly associating themselves with the said decedent and by gaining a predominance over his will and mind by persuasion and inducement, did, as your petitioners are informed and believe, by such persuasion and undue in-

fluence overcome the will of said decedent, if any he then possessed, and did fraudulently and wickedly induce the said decedent to sign his name to the said document or alleged will; that the said signature was obtained wholly by the exertion as aforesaid of such undue influence and fraud exerted upon the mind of the decedent, all of which caused him to sign his name to the said document, and that except for such acts and undue influence the decedent would not have signed his name thereto.''

An answer was filed by proponent, denying the aforesaid allegations, and, on the contrary, affirmatively alleging due execution of the will and that the testator was of sound and disposing mind, etc.

The issues thus framed have been twice submitted and tried to a jury in the district court. At the first trial all the issues were found in favor of the proponent, except as to the issue of undue influence, which the jury found in favor of the contestants. Judgment being entered by the court upon that verdict, disallowing the admission of the will to probate, an appeal was taken to this court, and, upon review, we held that the evidence was wholly insufficient to support the verdict of the jury as to undue influence, and remanded the case to the district court, with directions that the proponent be granted a new trial. 50 Utah, 207, 167 Pac. 256. Upon the second trial the district court, deeming the evidence insufficient, withdrew the questions of due execution of the will, undue influence, etc., from the consideration of the jury, and submitted the one question only—whether or not the testator was of sound and disposing mind and memory when he made his will. Upon the issue of testamentary capacity the jury again returned a verdict in favor of contestants. From the judgment entered thereon proponent appeals, assigning as errors the following:

(1) The admission of the testimony of certain lay witnesses, wherein they stated that in their opinion the testator was of unsound mind and possessed of an insane delusion that his children were attempting to get his property away from him at the time he executed the will; (2) permitting

Dr. Ewing, an expert witness, to answer a hypothetical question; (3) denying proponent's motion for a nonsuit; and (4) insufficiency of the evidence to sustain the verdict of the jury, and that the same is against law.

On the former hearing before this court for review it was announced:

"This is a law case, and, in view of that fact, we have no right, nor have we the inclination, if we had the right, to interfere with the findings of the jury in such a case, where such findings are based upon any substantial evidence. We may, however, not disregard both our duty and our oaths of office, and permit a judgment to stand, unless it is based upon findings which are based upon some substantial legal evidence."

We also took occasion to then say, in passing on the permissibility of lay witnesses to testify and express an opinion upon the question of mental capacity of the testator at the time the will was executed, that—

"The facts upon which the opinion is based should be relevant to the issue and should not be remote in point of time."

At the second trial the contestants proceeded almost wholly upon the theory that the testator did not have testamentary capacity, not only general but more especially that testator was laboring under an insane delusion at the time he executed his will. Upon the theory that the testator was possessed with an insane delusion when the will was executed, contestants were allowed great latitude by the trial court in the introduction of the testimony of witnesses concerning the private life and affairs of the testator covering a period of upwards of thirty years, more especially concerning his acts and conduct with respect to his family affairs and domestic life up to the time of the severing of his family relations by a decree of divorce granted his wife in 1904, awarding her the house in Salt Lake City, property the legal title to which had been in the testator. All of that testimony (given principally by the contestants) was fragmentary in character, disconnected in detail, and necessarily very remote in point of time. Other testimony was given and received concerning the personal appearance of the testator and his physical infirmities; that at times he had violent headaches, was affected with

dizziness, and suffered with rheumatism; that he was hard of hearing and his eyesight was impaired; that he was not inclined to be talkative with friends and members of his family; that he was beggarly and miserly in his disposition; that he was a constant recipient of charity furnished by friends, neighbors, and the Relief Society of the Mormon Church, of which he was a member; that he hoarded his earnings, and deposited them in the bank under an assumed name; that he seemed afraid and suspicious of his children, and did not want them to know that he had money. A written statement and certain letters of the testator were offered and received in evidence in support of contestants' theory, among them a statement in the handwriting of testator, made presumably at or about the time the will was executed. It reads:

"They (the family) got my home and money by false pretend. All this, together, I deem this sufficient because of the cruel, unjust treatment I received while living with them. After making my life miserable it would be an injustice to my memory for them to share or enjoy any part of what I have by the assistance of kind-hearted and upright friends."

The letters referred to were written in Danish and consist of a series of six in number, addressed to relatives, a sister and niece, of the testator in Denmark concerning a contemplated journey there. As fairly illustrative of the character of these letters, all of the same import, we quote in full the first and last, written by the testator, as translated into English:

"Salt Lake City, January 17, 1912.

"Theodor and Louise—Dear Relatives: As I thought of journeying to Denmark this summer I ask you to give me a little information concerning conditions there; whether you can obtain a small apartment to rent and about what it would cost and likewise about what it would cost one person to live over there.

"I do not know whether I shall be able to travel there, but if I come and feel content in living in Denmark, then it would be best to stay there because I am too old to call it a pleasure trip.

"Be kind enough to give me the best information that you can procure when you write.

"Let me know how you and all the family are and I wish you health and happiness.

"We have had a hard winter for two and one-half months, but now it is thawing.

                                        "Peter Hansen,
"606 West 2 North, Salt Lake City,
                                        "Utah, U. S. A."


                        "Salt Lake City, October 22, 1915.

"Marie Nielsen—Dear Niece: There are no prospects toward my coming over to Denmark this year. I expected the whole summer to go in the society of missionaries but the church will not send them so long as the war continues and it is not well for me to travel alone because I cannot talk so that people can understand me and neither can I hear so that I can understand what they say; but it is very difficult to live alone as my health is very poor; and then that bad (wicked) war, many Americans have lost their lives in traveling over because of the Germans' barbarous advance. But if I live the winter through and circumstances permit, then would I be very glad to get over there by Spring. I long to see my sister and to talk with her while we live here on earth and I would like very much to see the whole family.

"Will you write and let me know how you and the whole family are and whether there are any prospects of peace and whether you think Denmark can escape being involved in the war.

"I enclose this small amount for postage, about 3 crowns and 70 to 75 ore.

"I wish you all well and send regards to the whole family.
                                        Peter Hansen,
"R. 358 North 5th West, Salt Lake City,
                                        "Utah, U. S. A."

Other written communications in the form of letters between the testator and the contestant Anna Hansen Richards,

expressing affectionate regard for each other, were offered and received in evidence on behalf of contestants. The last of these on the part of the testator was written a little more than a year before the will was made.

At the conclusion of the contestants' testimony they rested. Proponent then moved the court for a nonsuit, upon the ground that the contestants had failed to prove a sufficient case for the jury. Several reasons were assigned by proponent in his application for a nonsuit. However, the only one here pertinent and necessary to be considered was:

"The contestants have failed to prove or produce any testimony or evidence tending to prove that the alleged testator was lacking in testamentary capacity at the time he made. the proposed will; but, on the contrary, the presumption of law that he possessed such capacity at that time is sustained by the unimpeached testimony of the subscribing witnesses to said proposed will, by the proposed will itself, and by the testimony and evidence introduced on the trial by the contestants."

The application for a nonsuit was argued to the court by respective counsel, but before the court ruled the contestants announced their desire to reopen the case and submit the testimony of one other witness. Thereupon the court, very properly, we think, over the objection of prononent's counsel, ordered the contestants to proceed. The contestants then produced as an expert witness Dr. Brown Ewing, a specialist in mental and nervous diseases, and to him propounded a hypothetical question embodying in great detail the conduct, facts, and circumstances attending the testator's life for a period of over thirty years prior to the execution of the will. The witness was then interrogated and made answers as follows:

"Q. Now, assuming the truth of the statement which has been made to you, and basing your opinion upon your expert experience and knowledge, please advise whether or not in your opinion Peter Hansen, at the time he signed the will in question, was suffering from any mental disease which directly influenced the execution of the will and the terms thereof. A. I think he was a subject of insane delusions and

Vol. 52—36

irresponsible in his actions. Q. What medical term or defini-
tion would you apply to the condition of this man's mind at
the time he made this will?    A. Classified as a case of para-
noia with marked progression. Q. What would you say as to
whether this man, at the time he made his will, was suffering
from hallucinations or delusions, or mental abberation? A.
During a considerable time, probably from 1890, there was a
marked evidence of insane delusions of a systematized char-
acter which is characterized by the classification we speak of
as paranoia. Q. Is that disease always progressive? A. Pro-
gressive and always incurable. * * * Q. What would you say
as to the peculiar form of paranoia that this man was afflicted
with? A. I think there is marked evidence of delusion of
persecution and, would classify it under the persecutory type.
Q. What would you say as to whether this man knew what he
was doing, and exercising his intelligent judgment at the
time he made this will with respect to his children? A. I
think he did not, as he was under the control of an insane
delusion.''

The letters written by the testator to friends in Denmark,
heretofore referred to, and the will had not been read to the
witness before making the foregoing answers. He was asked
by proponent's counsel to read them, and, after doing so,
cross-examination of the witness proceeded as follows:

''Q. Now, doctor, assuming that on the 3d day of Novem-
ber, 1915, the man who wrote those letters came to Mr. Iver-
sen's office, and assume that Mr. Iversen was the only edu-
cated man of business that he knew, came there without pre-
vious appointment, unexpectedly so far as Mr. Iversen is con-
cerned, told Mr. Iversen he wanted to make a will, gives him
all the information he had, which we find contained in the
will, and after it was written read it over carefully and
stated that it was what he wanted, and signed it in the
presence of Mr. Iversen and Mr. Core, that neither Mr. Iver-
sen nor Mr. Core saw anything irrational in his conduct, but
on the contrary his mind seemed perfectly fresh and clear,
and he knew what he wanted; can you say that at the time
he executed the will he did not understand fully and in-

telligently the nature of the business in which he was engaged, and that he did not comprehend generally the nature and extent of his property, which consisted of his estate, and which he intended to dispose of, and did not recollect the objects of his bounty at that time? A. If the statement made in the will as to the kindness of the beneficiaries toward him were correct, he believed them to be correct, I could find no fault with it. I think he knew what he was doing.''

On redirect the witness testified:

''Q. The last answer is based solely upon these facts as submitted? A. Absolutely. Q. And do not affect the opinion that you have hitherto expressed upon the hypothetical question? A. Not at all, because the hypothetical question as given to me carries well-marked delusional concept. The other question as submitted by Mr. Wallace does not. It does not give history of any delusional concept whatever. Q. Assuming the facts as narrated by Mr. Wallace should be added to the hypothetical question, would you still answer, as you did in the first instance, that this man was laboring under an insane delusion? A. It would make no difference in my answer at all.''

The facts and circumstances surrounding the execution of the will were testified to by the subscribing witnesses. That there was due execution of the will by the testator in conformity with the formalities of our statutes admits of no doubt. The subscribing witnesses, one of them the scrivener who prepared the will for the testator, were experienced business men and had known the testator for many years. These witnesses testified that there was absolutely nothing attending the execution of the will that would indicate that the testator was not acting with intelligence and comprehended the act or business in which he was engaged. They also testified that in their opinion the testator was of sound mind and memory when he signed the will.

Upon the question of general dementia Mr. Chief Justice Frick, of this court, writer of the former opinion, took occasion to comment upon and discuss the evidence then befor this court for review. While some additional

testimony bearing on the question of general in-
capacity of the testator to make a will was adduced at
the last trial, we think what was said by Mr. Chief Justice
Frick in the former opinion is applicable here. We will
therefore not take occasion to again discuss the testimony, nor
comment upon it relative to general incapacity, nor to say
more than that the testimony is clear and convincing that the
testator thoroughly understood and comprehended the ef-
fects and consequences of what he was doing when he signed
the will, and in that regard met the requirements of the
statute requisite to the execution of a valid will.

As we have pointed out, Dr. Ewing, as an expert witness,
upon a detailed statement of the testimony given by lay wit-
nesses, expressed an opinion that the testator, at the time of
the signing of the will, was not with respect to his children
exercising intelligent judgment; that he was under the con-
trol of an insane delusion and therefore "irresponsible in his
action." There is absolutely no evidence in the record tend-
ing to show that prior to 1904, when family affairs and domes-
tic difficulties culminated in the decree of divorce awarded
the testator's wife, but that the mind of the testator was
normal, and that he had never before manifested any intent
or purpose of disinheriting any of his children. He was
then nearing seventy years of age. The youngest child was
about sixteen years of age. Testator was then broken in
health and so physically infirm that it was beyond him to en-
gage in hard manual labor to earn a livelihood. None of the
children thereafter contributed, or administered in the
slightest degree, to his physical needs and comforts, neither
by way of care, personal attention, nor by contribution of
means whereby they might be provided. True, he had some
money, $100 paid to him by the divorced wife upon the divest-
ment of his title to the family home, worth, approximately,
at the time, $1,500. He may have had, as the record shows,
some money besides. That he was thereafter dependent for
care and attention upon the charity of friends, neighbors, and
the charitable organization of the church of which he was a
member there can be no doubt. His whole life had been in-

ured to hardships. He continued to labor at odd jobs, and accumulated, in fact hoarded, money up to the time of his death; in what amounts from time to time the record does not show, except from May 30, 1913, up to the time of his death, May 26, 1916, he deposited small sums in and withdrew money from the bank, presumably as he deemed his necessities required. That he strongly believed that he had been injured and wronged by the divorce proceeding and unjustly defrauded of his property rights in his home, and that he had been unjustly treated by his children, is made manifest, not only by his written declaration concerning his reasons for the making of the will heretofore set forth, but also by subsequent conversations with friends and neighbors in whom he had confidence, and toward whom he felt kindly disposed. The uncontradicted testimony of Mrs. Schraven, a disinterested witness, was:

"I reside on West Sixth South street, in Salt Lake City, and knew old man Hansen very well for about eight years. For the first two years he called at my house once every week, and during the last six years he called twice a week. He came to me on regular days. He would come and get his breakfast, and then bring in coal and kindling and do chores, but during the last years he was not able to do anything. He did not come as a social visitor. He came to work for me. His regular days were Tuesdays and Saturdays. Sometimes he helped us in the laundry, and with house cleaning, such as beating carpets and so forth. When he helped with the house cleaning, he sometimes stayed all day; but when he just brought in the coal and kindling, he would come about seven o'clock in the morning and leave at nine. * * *

"Speaking of his early life, he told me that he came to this country with his wife, and when he got to New York, or whatever place it was where he landed, she would not come West with him, and he came on, and she stayed there for a time, and returned to Denmark, writing him from time to time for money, which he sent; and when she finally arrived in this country, it was evident that she was about to have a baby, and he was forced to turn his plural wife out of bed and

put this woman in it. In the meantime, he had married his plural wife. * * * He had spoken to me about his youngest daughter. He said that she used to come to see him once in a while, not very often, and the last time she came she wanted to borrow $10 for a wedding dress. He told her he would not loan it to her, but would give it to her, and she told him they were not going to have any wedding; but he afterwards found out that they had a wedding, but did not ask him to attend.

"I first met Peter Hansen through Mrs. McConnell. He was doing chores at her house for her, and I told her to send him over to me. * * * I had always been kind and attentive to Hansen, and I think perhaps he spent more time with me than with any one else. I did not look for him to remember me in his will, because I did not know that he had any property to leave by will. He spent those mornings with me, as I have stated, talked over intimate matters with me, and I gave him work to do, and food, and paid him money for it."

The testimony of the other witnesses tends to show that the families of the residuary legatees under the will, for a number of years commencing in 1904, were friendly with the testator; that he did chores and light work for them, for which he was paid in money; that they took a kindly interest in him, for which he expressed his appreciation. Mrs. Mayme McConnell, a witness for proponent, and the wife of Ralph S. McConnell, named as a residuary legatee as "M. McConnell," testified:

"I am the wife of Ralph S. McConnell. We were married in 1904, and soon after moved into the house in front of the shack where Peter Hansen lived. That was, I think, in September. Our acquaintance with Hansen commenced the following Christmas morning, although I had seen him passing the window, going to and from his place, for several months before. Christmas morning mother and I greeted him, and that was the commencement of intercourse between us. He commenced to work for us, carried coal, chopped wood, and swept snow, until about 1910. Then he became quite feeble, and I told him he need not do the work any more. At that time my husband was connected with Morrison-Merrill Com-

pany. I was acquainted with Mrs. Schraven, who has just testified. I met her about ten years ago. When we moved from in front of Hansen's place, he said, 'I do not know what I will do when you folks go away.' My mother was Scandinavian, and we often had coffee in the afternoon and would give the old man a cup. Mr. Schraven and my husband were friends, and we were living neighbors, and it was through me that Mrs. Schraven met Hansen. I told her about the old man doing chores for us, and she said she could use a man like that, and wanted to know if he would be willing to come and work for her; if so, to send him over; so I told Hansen about Mrs. Schraven. I think I introduced Hansen to Mrs. Porte, Mr. MacGregor's mother. At one time we lived in a double house, and she lived on one side and we in the other, and as a result she asked him to come to her place to work. We lived in Salt Lake and Murray until the last ten years, and wherever we moved we saw Hansen periodically. He called upon us in the various parts of town where we lived. He had said he would miss us when we moved away, and I told him that we would not be far, and he could come to us just as he had been used to come. He formed a habit of coming Sunday mornings, but, as that was our late morning, we requested him to come some other morning. We always gave him his breakfast whenever he came."

The foregoing excerpts taken from the testimony of witnesses produced in behalf of proponent, and given on rebuttal after the expert witness Dr. Ewing had announced as his opinion that "if the statement made in the will as to the kindness of the beneficiaries toward him were correct, he [the testator] believed them to be correct, I could find no fault with it. I think he knew what he was doing"—in our opinion ought to be clear and conclusive to all reasonable minds that there was ample foundation in fact that the testator was not actuated by nor laboring under an insane delusion in making his will.

Counsel for contestants do not claim that the testator was generally insane, but contend "that he entertained beliefs respecting his children, and respecting other people, and

respecting his money and the disposition he should make thereof, which were without foundation in fact," and in the execution of his will he was the "victim of" progressive paranoia, an incurable disease, which related to and influenced the provisions made for strangers and the exclusion of his children. In other words, he was laboring under an insane delusion with regard to objects of his bounty. Counsel have cited no cases, nor authority, and we think none can be found, where similar facts and circumstances as detailed by the contestants' witnesses were held to be sufficient to support a finding by either court or jury of mental incompetency to make a will.

The term "insane delusion" is variously defined by law text-writers and the appellate courts. Numerous definitions will be found in 4 Words and Phrases (N. S.) pp. 3645, 3646, where the cases are collated. In 40 Cyc. 1013, it is defined thus:

"An insane delusion is a belief which has no basis in reason and which cannot be dispelled by argument."

It is similarly defined in 1 Underhill, Wills, section 91. The latter author in commenting (section 94) says:

"A mistake of fact, entertained by the testator as to the character and motives of a person who is his heir, which prompts and leads him to disinherit that person, or a strong and perhaps unreasonable prejudice against a person, is not alone an insane delusion, destroying testamentary capacity. Thus the fact that the testator believes that his relatives have ill-treated him, or that they are inimical to him, and have conspired to defraud him, and for that reason leaves his property to strangers, does not constitute an insane delusion, unless it appears that his belief was wholly without any basis whatever, and that the testator obstinately persisted in it against all argument which may have been employed to dissuade him. If there are any facts, however little evidential force they may possess, upon which the testator may in reason have based his belief, it will not be an insane delusion, though on a consideration of the facts themselves his belief may seem illogical and foundationless to the court; for a will, it is obvious, is not to be overturned merely because the testator has not reasoned correctly."

To our minds, admitting all the testimony of the contestants' witnesses to be absolutely true, upon which they and the

expert witness alike predicated their opinions as to the mental incompetency of the testator, yet, as a matter of law, he was not burdened with any insane delusion as to the objects of his bounty when he made the will. The opinions of witnesses as to mental incompetency, of necessity, must be founded on and be deducible from facts which, in law, if true, would in some manner justify the conclusion of the witness as to incompetency. Otherwise, they have no probative value whatever, and will not sustain a verdict of mental incapacity to make a valid will. *Potter v. Jones,* 20 Or. 239, 25 Pac. 769, 12 L. R. A. 161; *Frazier v. Jennison,* 42 Mich. 206, 3 N. W. 897; *In re Hansen's Will,* 50 Utah, 207, 167 Pac. 256.

We do not want to be understood as holding that the personal habits, the general behavior, eccentricities, age, physical infirmities, as testified to by contestants' witnesses, were not proper subjects for investigation in testing the mental capacity of the testator. These, and many other matters, are proper subjects of inquiry in this class of cases. So, too, were the attitude of the testator towards his children and the fact that he failed to substantially recognize them by way of bequests under the will are matters to be considered in the determination of the sanity of the testator. That the testator, of foreign birth, inured to hardship and scant means of living, did not measure up to the ideals of American life, should not mitigate against his right to dispose of his property by will.

"'Mere whimsical behavior, or eccentricities in dress, demeanor, and habits of life, constitute no incapacity to make a will or perform any other property transaction. Isolation from social companionship engenders usually peculiarities in this direction; and the unmarried or disunited of both sexes, those whose homes have been broken up, and who find no close domestic bond, such as smooths off the angles and rough edges of individual character by constant attrition, are the most prone to develop them." Schouler, Wills (2d Ed.) Section 149.

This man, from the time of the divorce, in 1904, lived practically the life of a recluse, aged and somewhat physically infirm. The children then remaining at the home (of which

the testator was then divested) remained with the
mother and gave her their aid and support until they
established households of their own. The testator took
up his abode at the little shack where he lived, without any
material assistance or attention at the hands of his children,
assisted only by friends and neighbors and the Relief So-
ciety of his church, until he fell by the wayside, helpless and
dying in the arms of strangers. During all those years, and
up to the time he made his will in 1915, his children re-
mained engrossed with their own personal and family af-
fairs, and, with one or two exceptions, never visited him to
administer to his wants. Those that did visit him took ab-
solutely no pains to administer to his comfort and welfare.
Some of his children did not see him or inquire concerning
his welfare at all. That he longed for social intercourse, and
dwelt much upon the deprivation of his former home, the
testimony very conclusively shows. That he thought of his
children, those who at all recognized that he had an exis-
tence, the record is equally clear. For years he sensed his
lonely situation, and intelligently planned and saved that he
might be able to take up his abode in the land of his birth,
near relatives in whom he doubtless believed, and thought
they might be interested in him and his condition in life.
Thwarted in that purpose on account of war conditions in
Europe, and feeling that the end was near, in the light of
all human reason is it to be wondered at that he turned to and
selected as the objects of his bounty strangers, those whose
families had in some measure been interested in and had
aided and comforted him? Analyzed from every human
standpoint, is it to be wondered at that the ties of kindred
did not bind this testator in the making of testamentary dis-
position of his property? Upon what reasonable hypothesis
may the courts penetrate the mind of this man and find that
his was an "unnatural will," or treat the testimony in this
case as even tending to establish that he was controlled by an
"insane delusion" in the making of his will? If, under the
record here, we are to sustain the contention of contestants,
that we may not disturb the verdict of the jury in finding the

will invalid, then, indeed, the civil right of making testamentary disposition of property in this state is but as the will-o'-the-wisp, and forever disappears upon the bald assertion of the medical expert that the individual who seeks to exercise the legal right to do so labored under an insane delusion, and that his eccentricities, habits, and conduct of life are conclusive of the fact. Such is not the law of wills.

It devolves upon us as a court to scrutinize carefully the testimony in a case like the one at bar, and determine whether or not there is any substantial evidence to support the verdict of the jury. If there be substantial evidence it becomes our duty, as announced in the recent case of *In re Swan's Estate*, 51 Utah, 410, 170 Pac. 452, to affiirm the judgment. If there is no substantial evidence to support the verdict, and the verdict is against law, as we here find, it is no less our duty to reverse the judgment. In view that we must reverse the judgment for the reasons stated, other errors assigned and pointed out by proponent do not become material here for decision, nor need we pass upon them, other than to say that we find no prejudicial error in the trial of the case, except the ruling of the district court denying the proponent a new trial upon the ground of the insufficiency of the evidence to support the verdict of the jury and that it is against law.

The present is the second appeal of this case to this court. Each time we have felt compelled to disturb the verdict of the jury on the ground of insufficiency of the evidence to support its findings. The record on the second appeal shows that the examination into the matters touching the testamentary capacity of the testator has been exceedingly far-reaching and thorough. We see no good reason, therefore, why the order of this court should not, on this appeal, be that the judgment entered upon the verdict be vacated and set aside and the will admitted to probate. It is so ordered. Costs to be paid as expenses of the estate.

FRICK, C. J., and THURMAN and GIDEON, JJ., concur.

McCARTY, J., died after the submission of the cause, and before the filing of this opinion.