PROVOSTY, J.
The de cujus, John W. Bradford, was 75 years old when he died. He had been a planter by occupation, and had lived on his farm, or plantation, of some 800 acres, which he managed himself. He owned, besides, some lands in Texas and other property. His nearest relatives were his brother, James Bradford, whom he made his universal legatee and testamentary executor, and the unmarried daughter of the latter, and a large number.of nephews and nieces, the children of his four predeceased sisters. Several years before his death he had his brother, who then lived in Texas, and, it seems, was impecunious, to come and live with him; and this brother and this brother’s daughter lived in his house and took care of him in the last several years of his life. He seems to have been at all times on pleasant and affectionate terms with all these relatives.
The nephews and nieces contest the will, which is in olographic form, on the grounds, first, that the testator was insane at the time of making it; second, that it is not signed .by him;’and, third, that it names as universa^ legatee a nonexistent or unknown' person.' ’
The will reads as follows:
“I institute my brother James Brother heir to my whole estate, real and pursonal and my-testamentary executer and detainer and deturner of my estate. In case of his death absence or disability I name my niece Wilie Bradford my testamentary executer and detainer of my estate Grand Cane this day of February 11 1908.
“[Signed] J. W. Bradfor.”
This will was made nine months before the testator’s death. He had then been an invalid, suffering from Bright’s disease, for three years and some months. During this period, and up to his death, his mind would wander, at times, - and be obsessed with illusions and delusions. These spells would usually come on in the night, and in the morning on his waking up, at such times as his kidneys would have stopped acting, and his system would have become suffused with uric acid, and would last from 20 minutes .to an hour. The disease first manifested itself in acute form and came near causing his death. He recovered sufficiently to be able to walk about the house and yard, and even occasionally as far as the field, but not to attend to his business. This he left entirely to his brother living with him. Some person always stayed in the same room with him at night; and, as a rule, he could not put on his clothes without assistance. From a portly, active man, neat in dress and particular of his surroundings, he became an emaciated, feeble old man, careless and indifferent of his appearance and of his surroundings. ■ ■
Neighbors and friends who visited him during these years never detected any signs of insanity in him; found him' always rational in his conversation.' The family physician never noticed any, after the acute stage of the Bright’s disease' had passed. He had. been at that time consulted as to the mental-condition Of his patient, but was not consulted afterwards; in' fact, in his visits to the' house thereafter, he never heard the’’ mental, condiíidn' of ‘Mr". Bradford’’ even'-alluded toi Abóút' a yehr ‘before'"the’ date of the will ’he.' *47 treated him for malaria, and found his conversation entirely rational; treated him at another time for some throat trouble. The daughter of the universal legatee, niece of the testator, who, as. already stated, lived with the testator, says that he would inquire of, and converse with, her father about the plantation affairs and other business, and would subscribe for the newspapers and read them, though never reading long at any one time. She also testifies to the circumstances under which the will was made, showing that it was of the testator’s own motion, and that he used a form in a book. The testimony of this young- lady is admirably — indeed, we may say, refreshingly — candid.
As indications of insanity the witnesses fbr the contestants say that he had a glare in his eyes, and would sit quiet and mute, like a dummy, and take no interest in what was going on around him; could not be drawn into a conversation; would answer questions rationally, but as laconically as possible, by a simple “yes” or “no” whenever practicable; had changed from habits of great neatness and particularity about his dress and surroundings to indifference and carelessness; looked like a tramp. “I was down there one time,” says the husband of one of the contestants, “and he was not in his room. We were in another room, and he got wild, and called to me to ‘let’s go home.’ ” The date of this occurrence is not given. Upon the foregoing facts, these witnesses freely express the opinion that the de cujus was insane.
This extreme taciturnity might have had some significance, if the evidence had not shown that the testator had all his life been a noticeably laconic and reticent man. The quietude and the indifference to dress and surroundings are clearly attributable to his physical condition. The glare in his eyes cannot have been marked, as it was not noticed by several witnesses who visited and ■conversed with him up to four or five months before his death.
Except the occasional spells brought on by the uric poison, we find in the record absolutely nothing — not a single circumstance — , which would go to show insanity. It is perfectly plain that the contestants and their witnesses mistook physical for mental decrepitude ; mistook the drooping spirits and the shrinking into the “lean and slippered pantaloon” of combined illness and old age for insanity.
Tha testator was an intelligent man, but had very little education. He wrote with difficulty. This accounts for those defects iu the will which are relied on by the contestants for saying that the universal legatee is: a person unknown, and that the will is not signed. It will be noticed that the will reads: “I institute my brother James Brother,” etc., and that it is signed “J. W. Brad-for,” instead of J. W. Bradford. The testator had but one “brother James”; hence the addition of the word “Brother” cannot possibly be anything else than an inadvertent repetition of the word “brother.”
As for the leaving out of the final “d” in the signature, there is no denial that the tes^ tator wrote and signed the will, and we think there can be no serious question of his having intended to sign his own name.
Such being the casej and the name being phonetically spelled and approximately correct, we have no doubt at all of the sufficiency of the signature.
This question of the sufficiency of the signature to a will being a new one in our jurisprudence, we shall give here, for the benefit of the profession, the fruit of the industry of the learned counsel of the plaintiff, as well as of our own, in looking up the French authorities upon that interesting point, though all this research was hardly necessary in so plain a case as the present.
The text of the Code Napoléon being the same as that of our Code, this French jurisprudence is highly instructive; but. by reproducing it here this court does not mean to *49 commit itself to everything that is there said.
In France, as a general proposition, any signature which will identify the testator as the author of the testament will suffice; such identification being the sole object of the signature. See, to that effect, Duranton, Vol. 9, No. 39; Vazeille, Commentaries on Art. 970, No. 7; Marcadé son, Art. 970. No. 41; Troplong, Des Donat, et Test. Vol. 3, No. 1495; Dalloz, Rep. De Legis, Vol. 16, No. 2723; Demolombe, Don. et Test. Vol. 4, No. 102, p. 92; Id. No. 110, p. 98. Contra, Toullier, Vol. 5, No. 373.
According to some -of the commentators, the family name without the Christian name, is sufficient, but is indispensable. Toullier, VI, 5, Nos. 373 et 374; Laurent, Vol. 13, No. 222; Huc, Vol. 6, No. 278; Baudry-Lacantinerie et Colin, Vol. 2, Nos. 1965 et 1971.
According to other commentators, a signature to a will expressed otherwise than by the family name is sufficient, whether the expression be merely by the Christian name of the testator, or by any other designation, so long as it is that which the testator was in the habit of using in signing acts. And in that sense is the French jurisprudence. Dalloz, Juris. Gen. Disposit.' Entre Vifs, Nos. 2723, 3008; Id. Supplement, No. 679 ; Dalloz, Juris. Gen. p. 848; Id. p. 90; Merlin, Rep. Vo. Signature, § 3, art. 4; Demolombe, Vol. 21, Nos. 102 et seq.; Aubry & Rau (4th Ed.) Vol. 7, § 666, p. 99; Planiol, Vol. 3, No. 2689.
So, although the proper signature of a married woman is by her maiden name, yet her signature by her Christian name, with the addition of that of her husband, will suffice, if she was in the habit of so signing. Rennes, 11 Feb. 1830, Quesnel v. De Comore, J. du P. 1830, p. 160.
So, when a bishop had adopted the mode of signing by means of a cross with his initials added. De Serdobin v. Seminary of Bayonne, Court of Cassation, March 23, 1824, J. du P. 1824, p. 543.
The opinion of the court of cassation in this last case is a most elaborate, full, andi learned dissertation upon the entire subject of the sufficiency of a signature. The privilege of thus signing by means of some mark, followed by initials, would seem, however, to-be confined to bishops, and not to be extended to private individuals, or even public officials.. Dalloz, Repertoire, Vo. Disp. Entre Vifs, No. 2724.
Where the testator signed, not his name,. “Michallet,” but a name which he had adopted for signing all his public acts, and under* which he was commonly known, namely, “Saint Ange,” the signature was good. Michallet v. Hernu, Paris, April 7, 1848, Journal, de Palais 1848, Vol. 1, p. 410. See, also, Berthonnet v. Billoux, Cassation, 10 Mars. 1829, J. du P. 1828-29, p. 781.
And so where the Christian name of the-testatrix was Anne, but she had always been, in the habit of signing Marie, the latter signature was held good. Rion, Dec. 4, 1809,. J. du P. 1808-09, p. 900.
On the other hand, a signature consisting.only of the Christian name and the initial of the family name would not be sufficient,, where the testator was not shown to have-been in the habit of so signing. Demolombe,. Vol. 21, No. 109; Aubry & Rau (4th Ed.) Vol. 7, § 666, p. 98; Baudry-LacantinerieColin, Vol. 2, No. 1971.
The Supreme Court of Colmar has held, however, that even such a signature suffices,, if from the circumstances of the case no doubt at all can arise but that the signature* was intended by the testator to be his signature. Burg v. Keller, Colmar, July 5, 1870, Dalloz, Juris. Gen. 1871, p. 105.
An Illegible signature, such as would not; enable the court to identify the name of the* testator, would not be sufficient. Baudry-Lacantinerie & Colin, Vol. 2, No. 1975.
Where, from the weakness of the testator* at the time of making the will, the signa *51 ture is scarcely legible, the question reduces itself to the one of fact, depending upon whether what is written appears or not to be the signature of the testator. Merlin, Rep. Vo. Signature, § 3; Vazeille, on Art. 970, No. S; Troplong, No. 1497; Dalloz, Rep. de Legis. Vol. 16, No. 2727.
Prom Dalloz, Suppl. Rep. de Legis. Vol. 5, p. 680, we translate, as follows:
“The signature ought to be legible. But this is all that can be required. To annul a will because it contains a fault in spelling would be going entirely too far.”
In René v. Dellevaux, Lyon, June 25, 1879, Dalloz, Juris. Gen. 1881, part 2, p. 135, where the testator, a man of little education, who was decidedly no prize speller, but had always theretofore spelled at least his name correctly, spelled it “Delavon,” instead of “Delavaux”; but there was no doubt of its having been his act, and intended to be his signature, and though the signature was scarcely legible, and required experts for its identification, the court held the signature to be sufficient.
So, likewise, even the absence of several letters will not vitiate the will, where the circumstances leave no doubt that it is the .testator who has thus signed; for instance, “Laquerie Ducheyla,” instead of “Laquererie Ducheylard.” But the will in this case was not in olographic form, which, perhaps, might make a difference. Bordeux, 5 Mai, 1828, Ducheylard v. Sejac de Belcaire, J. du P. 1827-28, p. 1435.
Says Laurent, Vol. 13, No. 226:
“As to names illegible or erroneously spelled, the question is one purely of fact. Illiteracy is still so prevalent, even among the well to do and wealthy, that few people are able to write even .a few lines without fault in spelling. Now, if defects of that kind are harmless when in the body of the act, why should they not be equally so in the signature ? Suffice it that it should be certain that the name is that of the testator. In the manuscripts of- well-educated, but busy, men a defect of another kind is met with. Their signature consists in shapeless and meaningless characters. Would these, too, have to be annulled? Assuredly not. If the signature of the testator were one of that kind, it would certainly be valid.”
From the brief of the learned counsel for the plaintiffs, we take the following, in the original French:
“Demolombe, Traité des Donations Entre-Vifs et des Testaments, IV, paragraph 102, page 92, says:
“ ‘Mais qu’est-ce que signer? Et en quoi consiste la signature?
“ ‘Réguliérement, signer un acte c’est y apposer son nom de famille, c’est-h dire le nom sous lequel on est inscrit sur les régistres de l’état civil, et y apposer, par conséquent, toutes les lettres alphabétiques dont ce nom se compose.’
“After discussing various cases of incomplete signature held to be good, the same author, in the same volume (paragraph 110, page 98), says further:
- “ TI se peut aussi que la signature soit affectée de quelque défaut physique. L’orthographe y manque, par exemple ; Ou le nom n’est pas écrit avec toutes les lettres dont il se compose; oubien il est illisible. De telles signatures, sont elles bonnes ?
“ ‘Au point oh. nous sommes c’est 13. une question de fait plus encore que de droit. En droit if faut toujours observer notre régle et rechercher si le testateur signait habituellement de la méme maniére, les mémes fautes et les mSmes incorrections; et, dans le cas de l’affirmative, le testament devra étre déclaré valable.
“ ‘Ajoutons que, indépendamment méme de ce moyen, la signature mal orthographiée, incorrecte, ou incompléte pourrait étre déclaré val able, si d’ailleurs, elle était bien reconnaissable et s’il était constaté, que le testateur a voulu sérieusement faire sa- signature. La circonstance qu’il n’y aurait qu’imparfaitement réussi 3 cause de sa maladie ou de son age ou de son défault d’instruction n’empécherait pas que le testament ne fut valablement signé; et l’état materiel de l’acte serait surtout a examiner.
“ ‘C’est par application de ces principes qu’un ai-rét du parlement de Flandre du 28 Septembre, 1740,' déclara valable le testament qu’un nommé Constantin avait signé Constintin et qu’un arret du parlement de Paris du 5 juillet, 1782, maintint aussi le testament -qu’on sieur Deion avait signé du nom Delooz. Plus récemment, une dame Laquererie Ducheylard ayant signé son testament du nom de Laquerie Ducheyla la Cour de Bordeaux, a déeidé, de méme que l’absence de quelques lettres, dans la signature du testateur ne peut faire prononcér- la nullité du testament, lorsqu’il est constant, comme dans l’espéce, que c’ést le testateur qui a ainsi tracé sa signature.’,”
Judgment affirmed.