[No. 12955.  Department Two.  April 25, 1916.]

## JULIA A. POINTS et al., Appellants, v. W. S. NIER, as Executor etc., et al., Respondents.[1]

WITNESSES—PRIVILEGE—WAIVER—PHYSICIANS AS WITNESS TO WILL. The testatrix's attending physician who attests the will is not excluded from testifying as to its execution and the testamentary capacity of the testatrix by Rem. & Bal. Code, § 1214, which provides that a physician shall not, without the consent of his patient, be examined in a civil action as to any information acquired in attending his patient which was necessary to enable him to prescribe or act for the patient; as the privilege is waived by requesting the attestation.

WILLS—EXECUTION AND ATTESTATION—EVIDENCE—SUFFICIENCY. The evidence shows due execution and attestation of a will where it appears that the testatrix, being too feeble to subscribe her name, was assisted in making her mark, stated that she understood it, and the witnesses attested it in her presence and in the presence of each other, upon a request to do so made in her presence; a signature by mark being sufficient, and a request being inferred from the circumstances, where another makes the request in her presence.

WILLS—MENTAL CAPACITY—EVIDENCE—SUFFICIENCY. A finding of testamentary capacity, upon conflicting evidence will be sustained where there was but one witness against the validity of the will, who was contradicted by two attending physicians who acted as attesting witnesses, although the mental condition of the testatrix was doubtful and suspicious and the will was in the sole custody of her husband and chief beneficiary, there being no circumstances preponderating against the finding of the lower court.

Appeal from a judgment of the superior court for Stevens county, Sessions, J., entered December 30, 1914, upon findings in favor of the defendants, sustaining the probate of a will, after a contest tried to the court on the merits. Affirmed.

*Carey & Johnson*, for appellants.

*Jesseph & Bourland*, for respondents.

HOLCOMB, J.—Mary Sousanna Nier, the deceased, died at the Colville Sanitarium, in Colville, Washington, on April 27,

[1]Reported in 157 Pac. 44.

1914. On April 26, 1914, she made what is purported to be her last will and testament. In this instrument, she willed all her property, real and personal, to her husband, W. S. Nier, excepting a small amount of wearing apparel, which was given to her niece, La Rena Miller, of Belgrade, Montana. On May 11, 1914, the purported will was admitted to probate and letters testamentary issued to W. S. Nier as executor. The deceased left property in Stevens and Spokane counties, of the total value, as inventoried and appraised, of $18,450. She had been married to W. S. Nier about two years prior to her death. All of her property was separate property. She had been married twice before her marriage to Nier, but had no children, and left surviving her, as her only heirs at law, Julia A. Points and Lucy Elizabeth Cannon, sisters, and her husband. Her husband was named as executor in the will.

The sisters of deceased contest the will on the grounds that (1) the testatrix did not subscribe or sign her name or mark to the purported will, nor did she request or authorize any one to subscribe or sign her name or mark to it; (2) that, if any person did sign the name or mark of the testatrix to the will, such person did not subscribe or sign his or her name to the will as a witness thereto; (3) that L. B. Harvey and S. E. Rosenthal did not subscribe their names as witnesses to the purported will at the request of the testatrix or in her presence; (4) that, at the time of the purported signing of the will by testatrix, she had reached a point of mental dissolution in consequence of surgical operations and long and intense suffering and pain, and by reason thereof was mentally and physically incapacitated to make or sign a will or to make any testamentary disposition of her property, or to understand or comprehend the terms of the will, which was prepared by her husband for her to sign; (5) that, at the time of the purported signing of the will by testatrix, her husband did, by force, fraudulent representations, undue influence and other means, attempt to cause her to sign the pur-

ported will but failed in his attempt; (6) that, thereafter, Nier took the will into his possession and did fraudulently mutilate, deface, and change the markings and names in the purported will; (7) that, at all times during the two years' time previous to the death of the testatrix, during her married life with W. S. Nier, he supplied her with intoxicating liquors and drugs, excluded friends from visiting at her home, and neglected to provide her with medical treatment and other necessary care, all for the purpose of undermining her constitution and shortening her natural life, with the ultimate object in view of obtaining her property. The court, after hearing the evidence, sustained the will.

I. It is first contended by appellants that the testimony of the witnesses Harvey and Rosenthal should have been excluded on the ground that their testimony was incompetent and privileged, because they were the physicians who attended deceased during her last illness. These witnesses testified, not only to the execution of the will by the testatrix, but also to the sanity of deceased and her mental competency to execute a will. Appellants quote the provisions of our statute, Rem. & Bal. Code, § 1214 (P. C. 81 § 1033), which reads as follows:

"A regular physician or surgeon shall not, without the consent of his patient, be examined in a civil action as to any information acquired in attending such patient, which was necessary to enable him to prescribe or act for the patient."

Cases are cited to the effect that, under such statutes as this, it is held that the privilege is personal with the patient, and that it applies in testamentary cases and cannot be waived by the heirs and personal representatives. We do not agree with the reasoning or the holding of the cases cited. 4 Wigmore, Evidence, § 2390, states the rule as follows:

"To request a physician to *attest one's will* is by implication to request him to bear testimony, if called on, to all facts affecting the validity of the will, and is therefore a waiver."

The same rule is stated by Wigmore as to privilege by attorneys in such cases. With reference to the privilege of attorneys in such cases, 4 Jones, Evidence, § 756, says:

"The privilege is waived, also, if the client requests the attorney to be a subscribing *witness to a will,* as this leaves the witness free to perform the duties of the position, and to testify to any matters in relation to the will and its execution of which he acquired knowledge, including the mental condition of the testator."

Rood, Wills, § 317, says:

"The person who signs the will for the testator, and the one who acts as his counsel and scrivener in drafting it, are competent as subscribing witnesses. When the testator assents to his spiritual, medical, or legal adviser subscribing as a witness to his will, he thereby waives his privilege of secrecy and confidence as to that matter, and authorizes and expects such adviser to testify to it."

See, also, *Blackburn v. Crawfords,* 3 Wall. 175; *In re Mullin's Estate,* 110 Cal. 252, 42 Pac. 645; *O'Brien v. Spalding,* 102 Ga. 490, 31 S. E. 100, 66 Am. St. 202. Our opinion is, therefore, that, if the testatrix requested these physicians to attest her will as witnesses or knowingly assented thereto, she waived the privilege, and they are competent to testify as to the execution of the will and the competency of the maker.

The further question arises, however, as to whether or not she did in fact request these witnesses to attest her will, or knowingly assented thereto. The evidence shows that there were present, at the time of the proposed execution of the will, these two doctors, the matron of the hospital, Lilian, Erickson, the testatrix, and W. S. Nier. The matron of the hospital had been nursing the testatrix during all her sickness in the hospital. The hospital belonged to Doctors Harvey and Rosenthal. The nurse testified as follows:

"One of the doctors called me in the room and told me to bring in pen and ink, which I did. The will was already unfolded and ready to sign. Mr. Nier, Doctors Harvey

and Rosenthal were present and Dr. Rosenthal told the testatrix to sign the will. I placed the pen in her hand, Mr. Nier said to the testatrix, 'You aren't signing anything away from you.' The testatrix attempted to sign her name but she was unable to sign it. Dr. Rosenthal told me to sign her name and make an 'X' out at the edge of the name, and I wrote the words 'Mary Sousanna Nier.' I then placed my left hand under her elbow and my right hand upon her hand and assisted her in making a cross. There was a cross made but I cannot remember whether it was made in a straggling condition or not. I do not remember anything about the letters 'M,' 'r,' and 's' in the word 'Mrs.' I was in the room all the time the will was being executed. While I was in the room, Mrs. Nier spoke no word or made no statements or request whatever. Mrs. Nier was suffering a great deal and we thought she might pass away at any time. At the time of the execution of the will and for about four days' time before her death Mrs. Nier was sinking and was irrational. At the time of the signing of the will Mrs. Nier was irrational and was not in a condition to transact business or to make a will. When the will was being signed, she knew something was going on there for she looked at it. I did not see either Dr. Harvey or Dr. Rosenthal sign the will. Dr. Harvey said after the signing of the will that they would do no signing that day as it was a legal holiday [Sunday]. I remember that she spoke to me on the morning of the day the will was signed, but I do not remember what she said to me nor do I remember what I said to her. What she said was at times rational and at times it was not. Mrs. Nier was unable to sign the will because of weakness. She always knew me. She knew me to the very last. I don't know if she recognized me the morning she died or not, but she always knew me because I was around her so much; I just lived in there mostly. I talked with Mrs. Nier the morning the will was signed, and, as a rule, I talked every morning. I base my judgment that she was not capable of transacting business upon the fact that she was getting worse and I had come to feel that she could not recover."

Dr. Harvey testified that he performed the operation upon Mrs. Nier and that her condition mentally, as far as he knew at that time, was the same as any other individual.

"She did not show any indication of mental decay or de-
rangement. That was before and at the time of the oper-
ation. After the operation, she seemed to improve for eight
or ten days, and then gradually faded away. I saw her
from one to three times a day,—that is, in twenty-four
hours. She was receiving a regular course of treatment
from Dr. Rosenthal and I. I think she did understand
and could understand what she was doing and the purport
and intent of the instrument. It must have been nine or
ten o'clock in the morning on Sunday, April 26, 1914, when
the will was signed. The nurse did all the writing. When
Mrs. Nier started to write her name she got trembly and I
think it was Dr. Rosenthal suggested to let the nurse write
her name and have her make her mark. Mrs. Nier having
died at about ten o'clock on the 27th day of April, 1914,
and this will having been made after nine o'clock on Sun-
day morning the previous day or the 26th of April, Mrs.
Nier's mind was not in a state of dissolution at the time of
making the will; not any more than any other patient in
the weakened condition she was. Mental dissolution is where
the mind is simply weakened by the diseased condition of the
physical make-up. She talked some at the time the will
was made, but I could not tell you a word she uttered. She
was able to talk. I thought she was in a state of mind at
the time this purported will was made to consider all of
her property and relatives and her duties toward them, and
she was not able to sign her name simply on account of her
weakened condition and nervous condition she was in. I
don't know whether she could have continued to write the
name or not. I think some people may be in such a weak-
ened condition as to be unable to sign their name to a will
and still be capable of making a testamentary disposition
of their property and some of them might not be. Each
case is a law unto itself under those circumstances."

He further testified that, after the will was signed by
mark by Mrs. Nier, he and Dr. Rosenthal signed it as wit-
nesses in her presence and in the presence of each other.
Dr. Rosenthal, the other attending physician and subscrib-
ing witness, testified, in brief, as follows:

"I saw her nearly every day and when seeing her I talked
with her. Her mind appeared to be normal. Of course, she

was in pain but, as far as I could see, she was rational, if that is what you mean. When we went into the room Mr. Nier had the will and requested us to witness Mrs. Nier's signature and before doing that Mr. Nier read the will, and we asked the patient if she understood the purport and if she wished to sign the will, and she answered in the affirmative. After the will was read to Mrs. Nier and after I asked her if that was what she wanted and if she understood it, she simply said, 'Yes,' and that was all. In my judgment Mrs. Nier was capable of understanding and was rational at the time she did this. In fact, the question of her being rational or not never entered my mind throughout the whole case because that was not one of the conditions of which I was thinking. I took it for granted all the time that she was rational. There was nothing to make me suppose that she was not."

He further testified that, after she signed the will by mark, he and Dr. Harvey signed it as witnesses in her presence and in the presence of each other.

II. A consideration of the foregoing testimony covers the contention of the appellants that the testatrix did not subscribe, sign, or authorize her signature of the name or mark to the purported will; that, if any person did sign her name or the mark of the testatrix to the instrument, such person did not subscribe as a witness thereto, and that the subscribing witnesses Harvey and Rosenthal did not subscribe their names at the request of the testatrix or in her presence.

Appellants cite the statute, Rem. & Bal. Code, § 1321 (P. C. 409 § 31), reading as follows:

"Every person who shall sign the testator's or testatrix's name to any will by his or her direction shall subscribe his own name as a witness to such will, and state that he subscribed the testator's name at his request."

The evidence here is, however, that the testatrix signed her name by mark, and if she was competent to cause that to be done, the fact that it was done with assistance would make it her signature. That a last will and testament can

be signed by a mark, is universally established. It is immaterial that her name was also signed thereto by another. A signature by mark differs from an authorized signature by another. 40 Cyc. 1102; Rood, Wills, § 254; *Succession of Bradford* (124 La. 44, 49 South. 972), 18 Ann. Cases, 766, and notes; *Wilson v. Craig*, 86 Wash. 465, 150 Pac. 1179; Schouler, Wills (3d ed.), § 309; *In re Kearney's Will*, 69 App. Div. 481, 74 N. Y. Supp. 1045.

"The request that witnesses should attest and subscribe one's will may be inferred from acts and conduct of the testator as well as his express words; the law regarding substance rather than literal form in such matters. It is not essential, therefore, that the testator should expressly ask the subscribing witnesses to attest his will. His acts, his gestures, may signify this request; whatever, in fact, implies his knowledge and free assent thereto. Indeed, the active part in procuring the witnesses and requesting them to attest and subscribe is not infrequently borne by some friend, near relative or professional counsel; and if such third person acts truly for the testator in his conscious presence and with his apparent consent, the legal effect is the same as though the testator himself had spoken and directed the business." Schouler, Wills (3d ed.), § 329.

III. The third and most serious contention by appellants is that, at the time of the execution of the purported will, the testatrix was not of sound and disposing mind and memory and had no testamentary capacity. This question is one that depends entirely upon the facts and circumstances shown as existing at the time. It is true that the nurse, whose testimony seems to be exceedingly disinterested and reliable, testified that Mrs. Nier had been irrational for a period of three or four days before the will was presented to her; that is, she thought she was. But she testified, also, that she talked with Mrs. Nier the morning the will was signed, and it is shown that the will was signed quite early in the morning. She based her judgment on the capacity of the deceased to transact business upon the fact that she

was getting worse and the nurse had come to feel that she could not recover. Against her testimony, there is the testimony of the two subscribing witnesses, and of the wife of one of them, who was about the hospital and the testatrix very frequently, that, at and about that time, the mind of the testatrix was rational. The opinion of this writer is that the mental condition of the testatrix was, to say the least, doubtful and suspicious; and the fact that the will was in the sole custody of her husband and the chief beneficiary of the will, who apparently himself caused its preparation by the attorney who drew it, although the testatrix had several months previously spoken to the attorney about preparing *a will*, and the fact that the husband, just before the execution of the will, stated to the testatrix that she "was not signing anything away"; and the fact that it was found necessary to cause the will to be signed by mark because she was unable from some reason to sign it herself, are all suspicious. But suspicion, however great, is not sufficient to nullify it. This court has laid down the rule in the case of *In re Gorkow's Estate*, 20 Wash. 563, 56 Pac. 385, quoting from Redfield on Wills, as to what the quantum of mental capacity to make a will is, as follows:

"The result of the best considered cases upon the subject seems to put a quantum of understanding requisite to the valid execution of a will upon the basis of knowing and comprehending the transaction, or, in popular phrase, that the testator should at the time of executing the will know and understand what he was about."

We hold the view that the right to dispose of one's property by will is one assured by the law and is a valuable incident to ownership, and does not depend upon its judicious use. *In re McDevitt*, 95 Cal. 17, 30 Pac. 101. As to proof of the competency of the maker, it is stated in 14 Ency. of Evidence, p. 369:

"The testimony of attending physicians is entitled to great and peculiar weight. It may overcome the testimony

of lay witnesses if based on personal observation and knowledge, or that of experts based on hypothetical questions; but not that of an uncontradicted witness as to what testator actually did in connection with the preparation of the will, or that afforded by proof of success in business matters."

In the same work, page 390, it is said:

"It is the function of subscribing witnesses to inspect and judge the mental condition of the testator before they sign the will. It is presumed that such witnesses performed their duty. The fact may be inquired into on their cross-examination. Hence, peculiar weight is given their testimony if it is in accordance with their attestation, and it is often disparaged if it differs therefrom."

The trial court, having had the benefit of seeing and judging of the demeanor, as well as hearing and weighing the testimony, of all the witnesses in this matter, found in favor of the competency of the testatrix. Without some circumstances or evidence preponderating against that testimony and the finding of the court thereon, we cannot overturn it. There are not sufficient circumstances or evidence against the same in this case, and we do not feel warranted in reversing the judgment and nullifying the will.

V. As to the allegations that there was fraudulent misrepresentation, coercion, or undue influence used upon the testatrix to procure the execution of this will, and that there was mutilation and defacement of it after its execution, there is no sufficient testimony to support them.

The judgment of the superior court is, therefore, affirmed.

Morris, C. J., Parker, and Chadwick, JJ., concur.