In re McCOY'S ESTATE.
THEILIG v. COOPER.

No. 5754. Decided January 4, 1937. (63 P. [2d] 620).

*Wallace Calder*, of Vernal, for appellant.

*Ray E. Dillman*, of Roosevelt, and *Dallas H. Young*, of Vernal, for respondent.

**EPHRAIM HANSON**, Justice.

The proceeding before us involves the contest of a petition to probate a will alleged to have been made by Sarah C. McCoy, also known as Kate McCoy. Mrs. McCoy died December 30, 1934, at the age of 92 years. She was a resident of and owned real and personal property in Uintah county, Utah, at the time of her death. The appellant, R. C. Cooper,

shortly after her death, filed a petition in the district court of Uintah county praying for the admission to probate of an instrument which he alleged was the last will and testament of Mrs. McCoy, he being named therein as executor. Under the provisions of this alleged will, Mrs. McCoy left $1,000 to her sister Ellen Theilig and the rest of her property to her niece Nellie Holder. In due time Ellen Theilig filed written objections to the admission of said will to probate. The matter was then set for trial and was tried before the court sitting without a jury. The court found in favor of the contestant and refused to admit the will to probate. Mr. Cooper, proponent of said will, has appealed to this court from that decision.

We quote so much of the findings of fact made by the trial court as is pertinent to the issues here before us:

"4. That said purported will offered for probate, was made on the 25th day of December, 1934, and the Scrivener who made said purported Will, was called to decedent's home and to her bedside by the husband of the principal beneficiary, Nellie A. Holder;

"5. That at the time said purported Will was made, the said Sarah C. McCoy was not of sound and disposing mind and memory and she was unable to comprehend the purpose or the nature of the business that was then being transacted or the purpose or consequences thereof and was unable to know what was then being done;

"6. That the affixing of the signature, of the said Sarah C. McCoy, on said purported Will, was not the free and voluntary act of the said Sarah C. McCoy, and that said Will was not signed by the attesting witnesses at her request."

In order to avoid repetition, we shall proceed to a discussion of the various assignments of error urged by appellant without first going into the evidence. In her brief, respondent has made the bald conclusion that the abstract filed herein by appellant is wholly insufficient under the rules of this court, and does not attempt to offer any argument or assistance with respect to some of the most vital issues before us. True, the abstract is not so complete as it might be, but certainly respondent is not warranted in assuming that appellant, because he filed such an abstract,

thereby waived all assignments of error and his objections to the sufficiency of the evidence to sustain the findings made by the trial court. We think the objections raised by appellant's assignments of error are properly before us and shall proceed to dispose of the same.

Appellant contends that finding No. 5, above quoted, and that part of finding No. 6 which finds that the affixing of the signature of Mrs. McCoy on said will was not her free and voluntary act, are findings on matters not put in issue by contestant's written objections. The first ground of contest alleges, in effect, that when said will was made decedent had been for several days prior thereto suffering intense pain and had been administered narcotics and sedatives, and because thereof her mind was affected and she was unable to recognize people and relatives who were known to her for many years; that Mrs. L. C. Pearce urged her to make a will, but when the purported will was made, decedent was unable to originate an idea and her only power of expressing a wish and her only mode of communication was by adopting suggestions made by those who attended her when the will was drawn; that said will was not the free and voluntary act of decedent, but was made at the suggestion of Mrs. Pearce at a time when the mind of decedent was deadened and benumbed by administration of drugs and narcotics, and because of this decedent was unable to comprehend the nature or value of her property or to understand to whom she was devising and bequeathing her property. In his answer to this objection, appellant specifically alleged that "decedent was in possession of her full mental powers and of disposing mind and memory at the time she made said will."

Appellant argues that contestant pleaded undue influence by Mrs. Pearce and not mental incompetency to make a will. With this we cannot agree. All that is alleged with reference to Mrs. Pearce is that she urged the making of a will and the one made was made at her suggestion. This did not amount to undue influence. The burden of the objection re-

lates to the inability of Mrs. McCoy to know what she was doing, to originate or be responsible for any idea, and to know the value or nature of her property or to understand to whom she was devising and bequeathing it. According to the allegations she could only follow the suggestions of others and her mind, at the time, was benumbed by narcotics and sedatives. That this put in issue the question of her mental competency was recognized by appellant when he answered and specifically alleged she was of sound and disposing mind and memory. While the objection above outlined may not have been as specific and definite as it might have been relative to Mrs. McCoy's mental incompetency at the time the will was made, we believe it sufficient to raise that issue, especially in view of appellant's answer and the fact that the case, to all intents and purposes, was tried upon the theory that that was one of the principal issues.

We also think said objection fairly places in issue the question whether the affixing of Mrs. McCoy's name to the will was her free and voluntary act. If she was incapable of originating an idea and could only express herself by adopting the suggestions of others, then the affixing of her name would not be her free and voluntary act. In addition, it is alleged that the will was not her free and voluntary act. This allegation is broad enough to include within its scope such acts as were to be performed by her to make a will and necessarily would be an allegation that one of the requisites to a valid will, namely, affixing her signature thereto, was not accomplished as a free and voluntary act.

Appellant next urges that the evidence is insufficient to sustain the findings of the court heretofore quoted. In disposing of the issues thus presented, we must bear in mind that this court has held, and is committed to the doctrine, that a will contest, such as is here involved, is a law case, and that this court will not interfere with the findings of the trial court where such findings are supported by substantial evidence. *In re Hanson's Will,* 50 Utah 207, 209, 167 P. 256; *In re Frandsen's Will,* 50 Utah 156, 167

P. 362; *In re Swan's Estate,* 51 Utah, 410, 170 P. 452; *In re Ford's Estate,* 70 Utah 546, 261 P. 15. It is our duty, however, to give the evidence careful scrutiny to determine whether or not there is some substantial evidence to support the findings. *In re Hansen's Will,* 52 Utah 554, 177 P. 982.

The evidence on the matters covered by the findings of the trial court is conflicting. Mrs. E. R. L. Cooper, a practicing attorney, who prepared the will, testified as follows: In August of 1934, Mrs. McCoy came to her office and said she wanted a will made but did not want it made then. Mrs. McCoy said: "When I am sick I want you to come and take care of my affairs." Nothing was done towards drawing a will until December 25, 1934. On that date Mrs. Cooper went to Mrs. McCoy's home, first about 10 o'clock a. m., and again shortly after noon. Mrs. McCoy was asleep when Mrs. Cooper first visited her, but was awake when she arrived the second time. She greeted Mrs. Cooper and spoke about it being Christmas Day. Mrs. Cooper sat on the bed, and in response to questions, Mrs. McCoy stated she was ready to make her will and wanted to leave $1,000 to her sister Ellen Theilig, respondent herein, and the rest of her property to her niece Nellie Holder. Cliff McCoy, a stepgrandson of Mrs. McCoy, was sitting by the bed at the time, and Mrs. Cooper testified he verified the $1,000 bequest to respondent. Mrs. McCoy was lying on a bed in a room in the west part of the house. This room was practically one with a room to the north, only a sort of archway separating them. A stove and chair stood in the north room just beyond the arch. Leading east from the north room was a hall which led to the kitchen. Mrs. Cooper, after getting the details above mentioned, went to the kitchen and there wrote out a will with pen and ink. She then returned and read the entire will to Mrs. McCoy. She asked her if that was what she wanted and if it was her last will, to which she answered, "Yes." Mrs. McCoy indicated she wanted Mrs. Pearce and Mrs. Glines to sign as witnesses, but, since the latter was occupied in supporting Mrs. McCoy while she was sitting

up in bed, the name of Argyle Roper was suggested as a witness. This met her approval. Mrs. McCoy asked for pen and ink and attempted to sign her name, but finding she could not keep the pen on the line, she adopted the suggestion of Mrs. Cooper that the latter steady her hand. Mrs. Cooper steadied her hand and spelled out the letters of the name. After Mrs. McCoy's name was affixed, Mrs. Cooper walked around the bed to the archway and there procured Mr. Roper and Mrs. Pearce to sign as witnesses. The former signed by using the bottom of the chair as a table on which to write, which was standing near the stove about four feet from the bed. The latter held the will on her knee with her foot on the same chair when she signed. Mrs. Cooper further testified that Mrs. McCoy was of sound and disposing mind and knew what she was doing. On cross-examination it appeared that Mrs. Cooper was somewhat hard of hearing but could understand if the speaker spoke distinctly. She was not able to state definitely whether the motive force in signing Mrs. McCoy's name came more from Mrs. McCoy or from herself. Mrs. Cooper might have written what Mrs. McCoy was trying to write. After the will was executed, Mrs. McCoy said she was tired and they laid her down in bed. She then seemed to be suffering intensely. While they were holding her up her head dropped and nodded.

Mr. R. C. Cooper testified he shook hands with Mrs. McCoy and talked to her. He corroborates Mrs. Cooper as to the conversation relative to making the will and the disposition of the property, the reading of the will, and the procuring of the witnesses. He further testified that Mrs. McCoy remained sitting up in the bed until after the witnesses signed. Mrs. McCoy was very sick, but spoke distinctly though not very loud. She recognized him and she spoke to Cliff McCoy by name. In his opinion she was of sound and disposing mind and memory and her mental condition was very good.

Mrs. Pearce, one of the witnesses to the will, testified she had attended Mrs. McCoy for several days, but was not

present during the time the provisions of the will were discussed or before the will was drafted.  She was present when Mrs. Cooper read the will.  Mrs. McCoy indicated it was her will.  Mrs. Pearce saw her sign and saw Mr. Roper sign the will, and she signed her own name as a witness at Mrs. Cooper's request.  Mrs. McCoy did not ask her or any one to sign as witnesses.  She and Roper signed by the chair.  In her opinion Mrs. McCoy was of sound mind and competent to make a will.  Mrs. Pearce had tried to get Mrs. McCoy to make a will a few days before, but she stated she was not going to; they could fight over her property.  On Christmas Day she was suffering intense pain and had so suffered for several days previously.  They gave her sleeping tablets to produce sleep.  It was a little difficult for Mrs. McCoy to talk.  The witness could not say definitely whether Mrs. McCoy remained sitting up while the witnesses signed or whether she was laid down or whether she was asleep.

Argyle Roper testified he was standing near the stove and archway between the rooms when the will was signed.  He came into the house while Mrs. Cooper was out in the kitchen writing the will.  Mrs. McCoy then appeared to be asleep.  When the will was brought in, Mrs. McCoy was raised up.  She said something but the witness could not understand her.  Only a part of the will was read to her, and Mrs. Cooper asked something to which she shook her head.  They put a pen in her hand, and after they had stood by her some time, Mrs. Cooper said: "We have her cross."  Mrs. Pearce asked if that would stand and Mrs. Cooper answered that it would hold good any place.  After the will was signed, Mrs. Cooper took it out to the hall and appeared to be writing on it.  While she was in the hall, Mrs. McCoy was laid back in her bed.  She looked like she was asleep and no one talked further with her.  Mrs. Cooper came back and asked Mrs. Pearce and himself to sign as witnesses.  Mrs. McCoy said nothing about him signing.  He kneeled by the chair and signed at Mrs. Cooper's request.

The following witnesses were called by respondent:

Clifton McCoy, stepgrandson of Mrs. McCoy, testified he visited her Christmas Eve about 6 or 7 p. m. She then carried on a conversation with himself and Mrs. Pearce. She was then normal and intelligent and her memory was clear. He took her some Christmas dinner at noon the next day. She was too weak to eat; the food fell out of her mouth. He was sitting at the bedside next to her, helping to hold her up, while Mrs. Cooper spoke to her about making a will. When she sat up her head dropped forward. Mrs. Cooper asked if she wanted to leave anything to her sister, the respondent herein to which she mumbled something which the witness could not understand. Mrs. Cooper said $1,000. Mrs. Cooper then asked about her niece, Mrs. Holder. Witness heard no reply at all from Mrs. McCoy, but heard Mrs. Cooper ask, "The rest of it?" He heard no reply to this question from Mrs. McCoy. On Christmas Day she did not say anything he could understand. She did not recognize him. She was suffering pain. When Mrs. Cooper left the bedside they laid Mrs. McCoy down. She mumbled something. Mr. Holder brought her false teeth to her. The witness was there again in the afternoon that same day and tried to talk to her but could not understand her very well. He was of the opinion that her mental faculties were such that she was unable to comprehend the ordinary affairs of life or tell what she wanted done with her property. The witness denied that Mrs. Cooper asked him what Mrs. McCoy said and that he answered she wanted Ellen to have a thousand dollars. It was Mrs. Cooper who suggested giving respondent $1,000.

Silvia Roper, wife of Argyle Roper, testified when she and her husband went into the McCoy home on Christmas Day they entered by way of the kitchen. Mrs. Cooper was then writing the will. Mrs. Cooper read only that part of the will relative to leaving $1,000 to respondent and the rest of the property to Mrs. Holder. Mrs. Cooper talked to Mrs. McCoy, but the witness did not hear the latter say anything. The witness testified concerning Mrs. McCoy placing her

mark on the will as testified to by Mr. Roper. Mrs. Cooper then went into the hall and wrote on the will. They laid Mrs. McCoy down when Mrs. Cooper left the room. Mr. Holder suggested Dee Jenkins sign as a witness, but Mrs. Cooper said he was not present when Mrs. McCoy signed and so was not competent. Mrs. Cooper did not return to the room where Mrs. McCoy was lying, but stayed in the room to the north and there arranged to have Mrs. Pearce and Mr. Roper sign as witnesses. Mrs. McCoy did not ask any one to sign as witnesses, and no one asked her if she wanted Mrs. Pearce and Mr. Roper to sign as witnesses. No one talked with her from the time Mrs. Cooper left the sick room and went into the hall. No one said anything to Mrs. McCoy about witnesses from the time Mrs. Cooper came in with the will from the kitchen. Mrs. Pearce suggested the name of Mr. Roper when it appeared Jenkins was not qualified. Mrs. Cooper then asked Roper to sign. The witnesses signed on a chair near the stove. Mrs. McCoy, at the time, was lying down in her bed and the witness' two daughters were standing close to her bedside. Some time after the witnesses signed, Mrs. Roper left the McCoy home, but returned that same afternoon. She did not expect to see Mrs. McCoy alive when she returned. She took hold of her hand, put an arm around her, and spoke to her. She tried hard to say something, but the witness could not understand anything she said. On the Saturday and the Sunday before Christmas, which fell on Tuesday, Mrs. McCoy stated she had no heirs and would not make a will. She also said she would give back a note she held signed by Mr. Roper. In Mrs. Roper's opinion Mrs. McCoy was not mentally able to transact business or know the probable consequences of what she was doing on Christmas Day.

James Reed testified he saw Mrs. McCoy about 4 p. m. December 24th. She tried to talk but he could not understand her. Mrs. Pearce was present and told him Mrs. McCoy said she would not make a will. At the time he saw her she

was in great pain. In his opinion she was not mentally able to carry on the ordinary business affairs of life.

Dee Jenkins testified that he had operated Mrs. McCoy's farm for her for nearly three years prior to her death and lived just across the road from her home. He visited her three or four times a day and made a fire in her stove for her each morning. She was so bad on the night of December 24th that he 'phoned to her niece in Colorado to come. He did not think she would live till morning. He stayed with her from 2 a. m. until morning. He told her he had 'phoned to her niece, and she stated they did not need to come as she would be dead by morning and they could quarrel and fight about it. About two days previously, she had said that Mrs. Pearce wanted her to make a will but she said she was not going to die, and if she made a will she would leave her property to those who had taken care of her. Mr. and Mrs. Holder came from Colorado about 9 a. m. December 25th. Shortly thereafter Mr. Holder asked Jenkins to ride with him to Mrs. Cooper's place. This he did. Mrs. McCoy was asleep when they got back. Later Jenkins was asked to 'phone Mrs. Cooper, as Mrs. McCoy was awake, and to 'phone Salt Lake City. When he got back from this errand, Mrs. Cooper was sitting at a table in the hall between the kitchen and the living room. Cliff McCoy and Mr. Holder were sitting on Mrs. McCoy's bed. Jenkins asked Mr. Holder for Mrs. Cooper. Mr. Holder said she was in the other room and went out to talk to her. Cliff McCoy walked out while Jenkins was in the room. Mrs. McCoy was lying down and was asleep. She did not wake up or talk to any one while Jenkins was there. Mr. Holder and Jenkins stepped out of the room onto the porch where Holder asked him to sign as a witness. Jenkins then stepped back into the room. Mrs. Cooper was then by the stove. She said nothing to Mrs. McCoy and did not go by the bed. Roper was signing when Jenkins came back into the room. Mrs. McCoy was asleep. She never woke up or moved a limb and no one tried to talk to her while he was in the room. Mrs. Cooper did not talk

to Mrs. McCoy after the witnesses signed. Shortly thereafter she and Mr. Cooper left. Jenkins wanted to have had an understanding with Mrs. McCoy relative to his share of the crops, but she was not capable of settling such matters. In his opinion she was not mentally competent to transact ordinary business or to know the consequence of a will or contract. Nothing but great pain would awaken her, and then she would awake with a jump and an awful pain in her side. She could not then transact any business. When he was there at noon those present were very much afraid of her condition and it looked like she was about to die.

Arbutus Roper, daughter of Argyle Roper, testified that there was some one holding Mrs. McCoy up in bed when she came in the room. She did not hear any one say anything to Mrs. McCoy nor did Mrs. McCoy say anything to any one. Mrs. Pearce and Mrs. Cooper were with Mrs. McCoy. The witness testified to the conversation relative to getting her cross on the will much the same as her father did. Mrs. Cooper then left the bedside and the witness later saw her return from the hall. They laid Mrs. McCoy back down when Mrs. Cooper left the bedside. Witness and her sister walked to the bedside and looked at Mrs. McCoy a minute or two. Her eyes were closed; she was groaning and she appeared to be barely breathing, just gasping.

Ninta Roper, sister of Arbutus, testified about the same as her sister. She thought Mrs. McCoy was dying. She saw Mrs. Cooper leave the bed and go into the hall, holding the paper in her hand. Edith Allen, stepgranddaughter of Mrs. McCoy, testified she visited her grandmother four times on Christmas Day, at 11 a. m., 12 noon, 5:30, and about 7 or 8 p. m. Mrs. McCoy was asleep or appeared to be in a stupor on each visit, though she was aroused in pain at the time the doctor examined her. However, she was not asleep all the time the witness was there. In her opinion Mrs. McCoy was not able mentally to know the probable consequences of a contract or will or to transact ordinary business affairs of life.

Wanda Redding sat up with Mrs. McCoy the night before Christmas and brought her a Christmas present. Mrs. Redding and Mrs. Pearce tried to make her understand about the present but they could not. It was put in her hand but she let it slip out and fall to the floor. When she was raised up in her bed, her head drooped forward and was almost uncontrollable. Her condition at 10:30 the next morning seemed to be worse. Her mental faculties both in the night and the morning were such that she was not able to transact ordinary business affairs of life nor would she know the probable consequences of a will.

N. J. Meagher, cashier of the local bank, testified that Mrs. McCoy kept a deposit account at the bank under the name of Kate McCoy. He was familiar with her signature and identified three certificates of deposit indorsed by her. In his opinion Mrs. McCoy did not initiate any of the strokes in connection with the signature appearing on the proposed will. He went into some detail explaining the reasons for his opinion. The signature on the will shows there was no free hand movement. It was drawn much the same as a child would draw out letters.

H. B. De Moisey, assistant cashier, thought the "Sarah" part of the signature was like the way Mrs. McCoy signed that name, but the "McCoy" part did not look like her signature.

In rebuttal, W. K. Kanistanaux testified that about December 1, 1934, Mrs. McCoy said: "I believe I will make a will. I want Ellen to have $1000.00 and Mrs. Holder to have the rest." Dr. F. G. Eskelsen testified he attended Mrs. McCoy December 17, 26, and 28, 1934, and gave her sleeping powders to produce sleep. These powders would have no effect on her mental faculties. On December 17 and 26 she was clear mentally and could respond normally to questions when the pain was not on her mind. R. C. Cooper testified that Mrs. Cooper did not leave the room after the will was signed by Mrs. McCoy. Mrs. Pearce also testified that Mrs. Cooper did not leave the room. She ad-

mitted having had the conversation with Mr. Reed about December 20th, but they talked in low tones. She previously had had two conversations with Mrs. McCoy which were the basis of the conversation with Mr. Reed. She gave Mrs. McCoy the medicine prescribed by the doctor on December 24th and 25th. Dr. Bullock was called on Christmas Day after the will was made.

For our convenience we have set forth with some detail the testimony of each witness as exhibited by the record rather than to give our conclusion as to the evidence of the respective parties. By so doing we have perhaps extended the opinion to undue length.

Certain basic facts are apparent from the foregoing testimony. Mrs. McCoy, at the time of her last illness, was 92 years of age. On December 24th and 25th, she was very sick and was in a very weak physical condition. She was not fully awake for any substantial part of the time. Due either to her weakened physical condition or to the sedatives given her, or to both, she would be aroused for the most part only by intense pain. During such times her mind would be centered chiefly on securing some kind of relief from the pain. During the night of December 24th and the morning of December 25th her condition was alarming to those in attendance, for they sent for her sister and niece. She remained asleep until about noon on December 25th. Mr. and Mrs. Holder arrived from Colorado about 9 a. m. that day. It is apparent that very shortly after their arrival they and those in attendance upon Mrs. McCoy had some conversations about getting a will made, for it was Mr. Holder who, within an hour or so after his arrival, went to get the attorney, taking Jenkins along to show him where she lived. There is no evidence whatever that before his arrival Mr. Holder knew that Mrs. Cooper was to draw the will or that Mrs. McCoy wanted to make a will or what her will, if made, would provide. Mrs. Pearce had tried to get her to make a will but she had refused. The subject of making a will certainly must have been dis-

cussed. But it is clear Mrs. McCoy had no part in such discussion, for she was not awake and was not awake when Mrs. Cooper came the first time. There is no evidence that, when she did awaken, any one suggested to her that she make a will, but, at Mrs. Pearce's direction, without Mrs. McCoy knowing anything about it, Mrs. Cooper was again summoned. It is evident that no will would have been made had not those in attendance made a somewhat pronounced effort to accomplish that end. While Mrs. Cooper testified that Mrs. McCoy wanted a will made when she got sick, yet other witnesses testified that she had refused to make a will only a few days prior to Christmas Day. Had she any serious intention to make a will, it seems pertinent to inquire why she did not send for Mrs. Cooper herself, as she had been seriously ill for several weeks. It is a legitimate inference to assume that those in attendance felt that her condition was so precarious that if a will was to be made at all it had to be made at the very first opportunity that Christmas Day. It is also fair to infer that some one in attendance had some information leading to the belief that if she made a will she would leave her sister Ellen Theilig $1,000 and her niece the balance of her estate, thereby giving the latter the bulk of the estate.

We do not wish to be understood by what we have said that we suspect any one of improper motives in procuring a will to be made. It may be assumed that what was done was done solely because of a desire to assist a sick neighbor. But the foregoing observations certainly have a place in considering whether Mrs. McCoy was of sound and disposing mind, whether the proposed will was her free and voluntary act and whether the witnesses signed at her request.

We are also convinced that when the name of Mrs. McCoy was affixed to the will, her physical condition was such that she did not have the strength to initiate or control the direction and shape of any of the strokes required in making her name. There are marks on the will which show that a pen had wandered aimlessly over the paper without

an attempt to write anything. Then the name "Sarah" starts right off without any apparent connection with or continuation of these marks. The lines in the word "Sarah" first appear somewhat shaky, but as they continue the shakiness disappears. The word "McCoy" shows no shakiness at all.

Appellant contends that since Mrs. Cooper was an attorney and drew the will and she, in the testatrix' presence, requested the witnesses to sign, this, in legal effect, was a request by the testatrix herself. The rule relied upon by appellant is stated in Thompson on Wills, p. 398, § 449, as follows:

> "But generally the witnesses are not required to subscribe the will at the express request of the testator. He need not formally request the witnesses to attest his will, as the request may be implied from his acts, and from the circumstances attending the execution of the will. Thus, a request will be implied from the testator's asking that the witnesses be summoned to attest the will or by his acquiescence in a request of another that the will be signed by the witnesses.
> "Where a will has been signed by the testator, a request made in the presence of the testator to persons to attest the will as witnesses made by the person who prepared the will, is equivalent to a request by the testator himself. Where the request is made by another and is approved of by some sign or act on the part of the testator and the witnesses with the knowledge of the testator and in response to such request, sign their names to the will the request is implied."

Other authorities on this subject are Schouler on Wills (3d Ed.) § 329; *Green* v. *Pearson,* 145 Miss. 23, 110 So. 862; *In re Nelson's Will,* 141 N. Y. 152, 36 N. E. 3; *Points* v. *Nier,* 91 Wash. 20, 157 P. 44, Ann. Cas. 1918A, 1046; *In re Chambers' Estate* (Wash.) 60 P. (2d) 41.

We do not dispute the rule of law above stated, but are the necessary elements involved in such rule present in the case before us so that the trial court could not do otherwise than to apply it? There can be no implied request, under such rule, unless what was done was done in the conscious presence of the testator as distinguished from and in addition to being in his physical presence. A request cannot be

implied as coming from a person who does not know what is being done, even though it is done in his physical presence. The testimony of the witnesses for respondent is to the effect that no one talked with Mrs. McCoy about witnesses; that her condition was such that she would not know what was going on or who was signing as witnesses; that Mr. Roper was suggested as a witness by Mrs. Pearce at a time when Mrs. McCoy was asleep and at such distance from her as to raise some doubt as to whether she could have heard had she been awake; that there was nothing in the demeanor or actions of Mrs. McCoy that would signify she understood and assented to the witnesses procured by Mrs. Cooper, but on the contrary, she seemed oblivious to all that was going on. In view of such testimony, we cannot disturb the trial court's finding that the witnesses did not sign at the testatrix' request.

Section 104-48-13, R. S. 1933, provides that a last will and testament, except a nuncupative will, is invalid unless it is "executed with such formalities as are required by law." Section 101-1-5, subsec. (4), R. S. 1933, provides that "there must be two attesting witnesses, each of whom must sign his name as a witness at the end of the will, at the testator's request, in his presence, and in the presence of the other." The court having found that the witnesses to the proposed will did not sign at the testatrix' request, it necessarily followed, under the above statutory provisions, that the will was invalid and was not entitled to be admitted to probate.

The evidence as to whether Mrs. McCoy was of sound and disposing mind and was capable of understanding the purpose or nature of the business being transacted and knew what was being done when the will was made is likewise conflicting. The witnesses testifying in this regard had about the same opportunity to observe Mrs. McCoy. They were her friends and relatives. They differed in their opinions drawn from the same kind of observations. It was the trial court's duty to weigh these

opinions and give effect thereto. The attending physician did not see her from December 17th to December 26th, the day after the will was made. His opinion cannot be said to be controlling.

What has been said also disposes of the contention that the evidence does not sustain the finding that the affixing of her signature to the will was not the free and voluntary act of Mrs. McCoy.

Appellant assigns as error the overruling of his objections to certain questions asked by respondent. James Reed testified he visited Mrs. McCoy on December 24th. He spoke a few words to her but could not understand what she said in reply. He could not say whether her eyes were open or not. Within two or three minutes after speaking to her he conversed with Mrs. Pearce, who was also present right by the bedside. The conversation with Mrs. Pearce concerned the making of a will by Mrs. McCoy. Over objection he was permitted to state the conversation as follows: He asked if Mrs. McCoy had made a will, to which Mrs. Pearce replied: "No, she hasn't; she will let them fight it out among themselves." This evidence was admitted on the theory that it related to a conversation had in the presence of Mrs. McCoy. The only purpose and effect of receiving such testimony would be that it tended to show that Mrs McCoy, at that time, had no intention to make a will, and would be entitled to receive some consideration in determining whether she made the proposed will. Had she then intended to make a will it would be expected that she would have corrected Mrs. Pearce when the latter quoted her as having said she would make no will. The conversation, apparently, took place by her bedside shortly after Mr. Reed had talked to her and she had endeavored to speak to him. The trial court was satisfied that the conversation took place in her presence, and that she understood what was being said. We see no reason why we should hold otherwise, especially in view of the fact that Mrs. Pearce had already testified, while called

as appellant's witness, that Mrs. McCoy had told her she would make no will. Also, other witnesses testified that Mrs. McCoy told them she would make no will. Appellant, therefore, could not have been prejudiced by the testimony of Mr. Reed to which he urged his objection. The situation is somewhat similar to the testimony permitted in the case of *In re De Laveaga's Estate,* 165 Cal. 607, 133 P. 307, where a witness had testified to the contents of a lost letter which had been written by testatrix' father when he made his will and which had been read in testatrix' presence, and which indicated that her father, in providing for her in his will, acted on the opinion that she was not of sound mind. When this letter was read, testatrix remained silent. The court held the testimony competent on the issue of her mental competency, as she naturally would have shown some interest when the letter was read or made some expostulations had she been of normal mind.

The appellant assigns as error the admission in evidence of the opinion of Mrs. Allen relative to Mrs. McCoy's mental capacity. Mrs. Allen visited Mrs. McCoy four times on Christmas Day. She testified that Mrs. McCoy was asleep on the occasion of each visit, except the time when the doctor attended her, at which time she roused in pain when the doctor examined her. She also testified that Mrs. McCoy was not asleep all of the time she was there. The rule governing the admission of opinions from lay witnesses as to mental capacity is stated in *Re Hansen's Will,* 50 Utah 207, 167 P. 256, 262, as follows:

"A witness should be permitted to state the facts fully, and if from the detailed facts the jury may draw an inference that the subject of the inquiry was of unsound mind, the witness may also be permitted to express his opinion respecting the sanity, and in that way enlighten the jury to some extent upon that question. Where, however, no such inferences are legitimately deducible from the facts testified to by the witness, he may not, nevertheless, give his opinion respecting the mental capacity of the testator. If that were permitted, the witness would entirely usurp the functions of the jury in such cases."

To the same effect is *In re Hanson's Estate (Mc Donald v. Soule)*, 87 Utah 580, 52 P. (2d) 1103.

Mrs. Allen was a stepgranddaughter of the testatrix. They lived in the same community and apparently visited with each other. The witness observed her grandmother's condition on four different occasions on Christmas Day, shortly before and shortly after the will was made. She saw her reactions to the examination given her by the doctor in the afternoon and that she then was aroused by pain. It appeared to the witness that she was asleep or in a stupor. Some of the time, at least, she was awake. In the circumstances, we do not feel inclined to hold that the trial court committed error in admitting in evidence the opinion of this witness.

On rebuttal, appellant sought to have Mr. Holder, husband of Nellie Holder, the chief beneficiary under the will, testify as to the mental condition of Mrs. McCoy at the time the proposed will was made. The court refused to receive such testimony on the ground that Mr. Holder, as husband of a beneficiary, was an interested party and incompetent to testify as to any transaction involving the deceased by virtue of section 104-49-2, R. S. 1933. It is not necessary to decide whether the husband of a beneficiary under a will is an interested party within the meaning of the statute, for this court has held that the statute referred to does not apply in a will contest such as is here before us. In the case of *Miller v. Livingston*, 31 Utah 415, 88 P. 338, 345, this court said:

"These authorities, and others which can be cited, hold that the controversy such as here is between living parties, who, on the one side, are the devisees or legatees under the will, and on the other, the heirs at law of the testator. The former claim to take the estate under the will; the latter, under the statute regulating the descent of estates, insisting that the alleged will is a nullity. The act of the testator in making the alleged will is the only subject-matter of the investigation. The estate of the testator is not interested. The interests of those claiming to succeed to it either by operation of law or by operation of the will are alone involved. The estate remains intact and undi-

minished whatever may be the result of the controversy, and the subject-matter of the investigation is not a transaction with nor a statement by the decedent. As to such an investigation, the parties to the suit and those interested in the result thereof are upon terms of equality in regard to the opportunity of giving testimony. Our conclusion, therefore, is that all the parties interested are competent to testify to any fact which is relevant and material to the issue involved."

The rule thus announced was approved in *Staats* v. *Staats*, 63 Utah 470, 226 P. 677.

Was this such prejudicial error as would require us to reverse the decision of the trial court? Upon the subject of Mrs. McCoy's mental condition, appellant had before the court the testimony and opinions of Mr. and Mrs. Cooper, Mrs. Pearce, and Dr. Eskelsen. Their opinions conflicted with the opinions of the witnesses called by respondent. Mr. Holder was not attempting to testify concerning circumstances and transactions different from those already in evidence. His opinion would have been drawn from the identical facts and circumstances from which the other witnesses drew their conclusions. We cannot see how his testimony, if admitted, wouuld have had the probable effect of producing a different result. In addition, such testimony could have had little material effect, under the evidence before the court, upon the question as to whether the witnesses to the will signed it at Mrs. McCoy's request. It is true that her mental condition at the time has some relation to that question, but there is substantial evidence which supports the trial court's finding that the witnesses did not sign at her request, assuming she was mentally competent to make the will. We do not think, therefore, that the exclusion of this evidence can be said to be prejudicial so as to require a reversal or can affect the result which we must reach in this case.

On rebuttal, appellant also called Mrs. Pearce as a witness and asked her to state her conversation with Mrs. McCoy that gave rise to the conversation with Mr. Reed, as

testified to by the latter relative to Mrs. Pearce saying Mrs. McCoy would not make a will. The court sustained respondent's objection that this was not proper rebuttal and stated that the only matter properly to be considered would be in connection with the conversation with Mr. Reed. The record does not disclose anything concerning the substance of the conversation sought to be shown. It is impossible to say, therefore, that the exclusion of that evidence was or could be prejudicial even if it constituted error and further discussion becomes unnecessary.

There being no reversible error, the judgment of the trial court is affirmed; costs to be paid from the estate.

ELIAS HANSEN, C. J., and FOLLAND, MOFFAT, and WOLFE, JJ., concur.